REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 1231

September Term, 2014

_____

HARRIETTE STEIN, PERSONAL
REPRESENTATIVE OF THE ESTATE OF
CARL STEIN, et al.

v.

PFIZER INC..

_____

Krauser, C.J.,
Graeff,
Kehoe,

JJ.

_____

Opinion by Krauser, C.J.

_____

Filed: May 31, 2016

The issue before us is whether Pfizer Inc., appellee, may be deemed an "apparent manufacturer" of an asbestos-containing cement, "Insulag," which purportedly caused the illness and subsequent death of Carl Stein from mesothelioma. The product at issue was manufactured and sold to Mr. Stein's employer, Bethlehem Steel Corporation, by Quigley, Inc., both before and after it became a wholly-owned subsidiary of Pfizer.

If Pfizer does not qualify as an "apparent manufacturer," then it is covered by the "channeling injunction" issued by the United States Bankruptcy Court for the Southern District of New York, in addressing Quigley's petition for Chapter 11 protection, that bars asbestos-related lawsuits against Quigley or Pfizer, such as the one before us, and directs such claims to a trust for consideration and, ultimately, compensation. If, on the other hand, Pfizer satisfies the criteria of such a designation, then Mr. Stein's family, appellants, may continue to pursue their products liability claims against Pfizer in the Circuit Court for Baltimore City, where this matter was initially filed by Mr. Stein, before his death.

The Baltimore City circuit court resolved this issue, by granting summary judgment in favor of Pfizer, after determining that it did not qualify as an "apparent manufacturer." We agree and shall affirm.

## I. The Stein Family's Lawsuit

Carl Stein (the "decedent") worked, from 1949 through 1985, as a bricklayer for the Bethlehem Steel Corporation at its Sparrows Point plant. During his thirty-six years of employment at the Sparrows Point plant, the decedent purportedly used Insulag, an

asbestos-containing cement, in the performance of his duties at that facility. After the decedent became ill, from his exposure to asbestos, he brought an action, in the Circuit Court for Baltimore City, against a number of business entities,[1] which had sold asbestos-containing materials to Bethlehem Steel, alleging negligence, breach of warranty, strict liability, fraud, and conspiracy. None of these entities is, however, a party to the instant appeal.

Then, in April 2012, the decedent, who had, by that time, been diagnosed with mesothelioma, succumbed to that disease. Fifteen months later, in July of 2013, his widow, Harriette Stein, individually, and as the personal representative of his estate, together with his surviving children, Carl B. Stein, Jr.; Mark A. Stein; Robert B. Stein; and Patricia A. Robinson (all of whom we shall collectively refer to as "the Stein family"), filed an amended complaint, in the same action, adding Pfizer Inc., the appellee, as a defendant in that suit, as well as several new counts averring loss of consortium and wrongful death. The theory underlying the Stein family's claims against Pfizer was that the decedent's exposure to an asbestos-containing refractory cement, called "Insulag," which was supplied to his employer,

---

[1]The complaint named the following entities as defendants: Union Carbide Corporation; John Crane-Houdaille, Inc.; Owens-Illinois Glass Company; General Refractories Company; Koppers Company, Inc.; Universal Refractories Company; A.W. Chesterton Company; CBS Corporation; J.H. France Refractories Company; The Goodyear Tire & Rubber Company; MCIC, Inc.; Metropolitan Life Insurance Company; General Electric Company; Bayer Cropscience, Inc.; International Paper Company; Cooper Industries, Inc.; Ferro Engineering; Foseco, Inc.; Schneider Electric USA, Inc.; Greene, Tweed & Company; Wallace & Gale Asbestos Settlement Trust; Mallinckrodt, Inc.; Crown, Cork & Seal Company; Georgia-Pacific, LLC; and Foster Wheeler Corporation.

Bethlehem Steel, by Pfizer's subsidiary, Quigley Company, Inc., was a substantial factor in bringing about his illness and resultant death from mesothelioma and that, because Quigley's invoices and marketing materials also bore Pfizer's trademarks, as well as its own, and because, in some instances, the words: "Manufacturers of Refractory Products," appeared beneath the exhibition of those corporate designations, Pfizer had, in effect, held itself out as a "manufacturer" of Insulag and was therefore liable for the illness and death of Mr. Stein, as an "apparent manufacturer" of that product.

## II. Quigley's Relationships with Pfizer and Bethlehem Steel

Quigley, founded in 1916, manufactured and sold refractory products, that is, products "that retain their strength at high temperatures," for use in steel mills, power plants, and refineries. *In re Quigley Co.*, 449 B.R. 196, 198 (S.D.N.Y. 2011), *aff'd*, 676 F.3d 45, 48, 59 (2d Cir. 2012), *cert. denied sub nom. Pfizer, Inc. v. Law Offices of Peter G. Angelos*, 133 S. Ct. 2849 (2013). One of the products it manufactured and sold, beginning in the 1930's, was "Insulag," a heat-resistant cement, which contained asbestos.

In August 1968, Pfizer acquired all of the stock of Quigley, thereby rendering that corporate entity a wholly-owned subsidiary of Pfizer. *In re Quigley Co.*, 676 F.3d at 47. After its acquisition by Pfizer, Quigley continued to operate as a separate and distinct corporation, designing and manufacturing its products, and maintaining its own sales and distribution network, without any participation by Pfizer in those processes. Yet, its

marketing and promotional materials, and its invoices, "began to include the Pfizer name, logo, and trademark." *Id.* (citation and quotation omitted).

Nor did its acquisition by Pfizer affect its relationship with Bethlehem Steel. It continued to directly supply Bethlehem Steel with Insulag, as it had done, periodically, since 1955, regularly shipping that asbestos-containing product to the decedent's place of employment, Bethlehem Steel's Sparrows Point plant, until 1974, when Quigley phased out its manufacture of Insulag, in favor of producing "Insulag AF," a non-asbestos containing cement.

After the decedent became ill, as a result of his purported exposure to asbestos at the plant, he filed suit, in the Circuit Court for Baltimore City, against Bethlehem Steel and a number of other business entities. During the course of that litigation, he was deposed, and, though he testified in detail as to the products to which he was exposed while working at the Sparrows Point plant, he did not mention "Insulag," or, for that matter, either Quigley or Pfizer, which is not surprising as, in the complaint he filed, Insulag was not alleged to have been the cause of his illness, and neither Pfizer nor Quigley were named as "defendants."[2] Nonetheless, there is no dispute that Insulag was used at the Sparrows Point plant, by bricklayers (such as the decedent), from 1955 to 1974,[3] which overlapped with the time

[2]The initial complaint is not in the record before us. The only docket entries in the record are those beginning with the filing of the amended complaint in 2012, when Pfizer and Quigley were first named as defendants.

[3]According to Quigley's answer to an interrogatory in another asbestos-related case, *In re Sparrows Point Steel Plant Asbestos Cases*, BML-3 (D. Md.), it supplied Insulag to the

period, from 1968 to at least the filing of this suit, during which Quigley was a wholly-owned subsidiary of Pfizer. Nor is there any dispute that the decedent worked at that plant throughout the time period when Insulag was being used there, and there is no disagreement that that product was supplied by Quigley.[4]

### III. The Quigley Bankruptcy and the "Channeling Injunction"

"After the health effects of asbestos became known," and more than 160,000 asbestos-related suits had been filed against Quigley (approximately 100,000 of which also named "Pfizer" as a defendant), Quigley filed, in 2004, a bankruptcy petition, under Title 11 of the United States Code ("Chapter 11"), in the United States Bankruptcy Court for the Southern District of New York. *In re Quigley Co.*, *supra*, 449 B.R. at 199. In its petition, Quigley sought court approval of a reorganization plan and, most relevant to the issue before us, "an injunction that would stop all asbestos-related lawsuits against itself and Pfizer." *Id.*

At the outset of those proceedings, the bankruptcy court "preliminarily enjoined all asbestos-related claims from proceeding against both companies (including those arising from Pfizer's own products) during the pendency of Quigley's bankruptcy proceeding." *Id.*

Sparrows Point plant from 1955 until 1960, and then again, from 1967 until 1974.

[4]The Stein family and Pfizer disagree as to whether Stein's exposure to Insulag was a substantial factor in causing his death. That issue was, understandably, not addressed by the circuit court, in granting Pfizer's motion for summary judgment, and therefore, it is not relevant to this appeal.

That injunction was subsequently amended, in accordance with 11 U.S.C. § 524(g),[5] to

channel asbestos-related lawsuits against either Quigley or Pfizer or both to a trust, largely

funded by Pfizer, for review and possible compensation of such claims.

The amended injunction (hereafter the "channeling injunction") provided that

> during the pendency of Quigley's chapter 11 case, all parties . . .
> are hereby stayed, restrained and enjoined from commencing or
> continuing any legal action against Pfizer alleging that Pfizer is
> directly or indirectly liable for the conduct of, claims against, or
> demands on Quigley to the extent such alleged liability of Pfizer
> arises by reason of—
>
> (I) Pfizer's ownership of a financial interest in Quigley, a past
> or present affiliate of Quigley, or a predecessor in interest of
> Quigley;
>
> (II) Pfizer's involvement in the management of Quigley or a
> predecessor in interest of Quigley; or service as an officer,
> director or employee of Quigley or a related party;
>
> (III) Pfizer's provision of insurance to Quigley or a related
> party;
>
> (IV) Pfizer's involvement in a transaction changing the
> corporate structure, or in a loan or other financial transaction
> affecting the financial condition, of Quigley or a related party,
> including but not limited to—
>
>> (aa) involvement in providing financing (debt or
>> equity), or advice to an entity involved in such a
>> transaction; or

---

[5]11 U.S.C. § 524(g) authorizes "a bankruptcy court to enter, along with confirmation of a reorganization plan, an injunction 'channeling' certain classes of claims to a trust set up in accordance with the reorganization plan, which trust will then make payments to both present and future claimants." *In re Quigley Co.*, 676 F.3d 45, 59 (2d Cir. 2012).

> (bb) acquiring or selling a financial interest in an
> entity as part of such a transaction.

*In re Quigley Co.*, *supra*, 676 F.3d at 48.[6]

Because Pfizer fell "within the ring of fire created by asbestos litigation," *In re Quigley Co.*, 449 B.R. at 202, the "channeling injunction" at issue, here, covered most, though not all asbestos-related claims against Pfizer, Quigley's parent company.[7]

## IV. The Scope of the "Channeling Injunction"

After the "channeling injunction" was issued by the bankruptcy court, a controversy arose as to its scope when, "[b]eginning in 1999," The Law Offices of Peter G. Angelos, PC (the same law firm that represents the Stein family in this appeal), "commenced lawsuits in Pennsylvania on behalf of plaintiffs who had been exposed to asbestos-containing products sold by Quigley and Pfizer, including Insulag." *In re Quigley Co.*, 449 B.R. at 199. As in the instant case, the Pennsylvania asbestos claimants alleged that Pfizer was an "apparent manufacturer" of Insulag. And, as does the Stein family here, they claimed that Pfizer, by

---

[6]Quigley's reorganization plan was ultimately approved by the bankruptcy court. *In re Quigley Co.*, No. 04-15739(SMB) (Bankr. S.D.N.Y. Aug. 16, 2013).

[7]As the New York federal district court noted in *In re Quigley Co.*, 449 B.R. 196 (S.D.N.Y. 2011), the "channeling injunctions may also cover certain types of claims against third parties related to the debtor, such as the debtor's insurer or corporate affiliates[.]" *Id.* at 202.

placing "its logo on Insulag packaging" and on advertisements, had "held itself out to consumers as a manufacturer of Insulag." *Id.* at 200.

When, in response, Pfizer filed a motion, requesting that the bankruptcy court enforce the "channeling injunction" as to those claims, the bankruptcy court granted that motion, holding that the "apparent manufacturer" claims were enjoined by the "channeling injunction" and ordering the Angelos law firm to cease its prosecution of all of its "apparent manufacturer" lawsuits in Pennsylvania state courts. *Id.* at 198-200. The United States District Court for the Southern District of New York disagreed, however, and reversed that decision, holding that the "apparent manufacturer" claims did not fall within the scope of the "channeling injunction." 449 B.R. 196.

That decision was, in turn, affirmed by the United States Court of Appeals for the Second Circuit. 676 F.3d 45. It avowed that a claim against Pfizer is subject to the "channeling injunction" only when Pfizer's alleged liability for "the conduct of or claims against" Quigley has arisen "as a legal consequence of" one of the four of the following: "(I) Pfizer's ownership of a financial interest in Quigley, a past or present affiliate of Quigley, or a predecessor in interest of Quigley"; "(II) Pfizer's involvement in the management of Quigley or a predecessor in interest of Quigley; or service as an officer, director or employee of Quigley or a related party"; "(III) Pfizer's provision of insurance to Quigley or a related party"; or "(IV) Pfizer's involvement in a transaction changing the corporate structure, or in

a loan or other financial transaction affecting the financial condition, of Quigley or a related party[.]" *Id.* at 48, 62.

Thus, as the Second Circuit observed, a claim against Pfizer, based upon a product manufactured by Quigley, that seeks the imposition of liability under such legal doctrines as "piercing the corporate veil," respondeat superior, or successor liability, is subject to the "channeling injunction," as the products liability it alleges "arise[s] as a *legal* consequence" of Pfizer's ownership, management, or control of Quigley. *Id.* at 49, 60. But that is not so, declared the Second Circuit, with respect to a claim that Pfizer was an "apparent manufacturer" of a product, actually manufactured by Quigley, because such a claim, explained that court, does not "in any legal sense" depend upon Pfizer's ownership, management, or control of Quigley. *Id.* at 62.

### V. Cross-motions for Summary Judgment

Predictably, the parties herein filed, in the circuit court, cross-motions for summary judgment as to the issue of whether Pfizer was an "apparent manufacturer" of Insulag. The Stein family claimed, in their motion, that Pfizer, as well as Quigley, had "put out the asbestos-containing Insulag to which [the decedent] was exposed" and that, though Quigley was the manufacturer of Insulag, Pfizer qualified as an "apparent manufacturer" of that asbestos-containing cement. Specifically, it cited advertisements and promotional materials for Insulag, as well as invoices, from sales of Insulag, issued by Quigley, from 1968 to 1974,

which displayed both Pfizer's and Quigley's trademarks and, in some instances, stated, beneath those trademarks: "Manufacturers of Refractory Products." That reference to "Manufacturers," maintained the Stein family, was an allusion to both Pfizer and Quigley, and thus established that Pfizer had held itself out as a "manufacturer" of the asbestos-containing Insulag.

Then, as further evidence that Pfizer qualified as an "apparent manufacturer" of Insulag, the Stein family noted that a 1971 end-of-year Pfizer sales report stated the sales price and cost of Pfizer's annual product sales to Bethlehem Steel (which presumably included sales of Insulag) but contained no mention of Quigley (or, for that matter, Insulag); and that each of several filings (Forms 10-K), by Pfizer with the Securities and Exchange Commission ("SEC"), during the 1990's, asserted that "[t]hrough the early 1970's, Pfizer (Minerals Division) and Quigley Company, Inc., a wholly-owned subsidiary, sold a minimal amount of one construction product and several refractory products containing some asbestos."

The evidence proffered by Pfizer, and relied upon by the circuit court in granting summary judgment, included the following unrebutted testimonial statements and documents: the deposition testimony of Louis Killian, the former plant manager of Quigley's New Jersey factory where Insulag was manufactured, stating that, even after Pfizer acquired Quigley, it "had no role in running Quigley's business" and "had no input whatsoever"; an affidavit of that same individual, asserting that, "[f]ollowing its acquisition by Pfizer, Quigley continued

to operate as a separate and independent corporation, manufacturing, selling, and marketing Insulag as it had done prior to the stock purchase" of its shares by Pfizer; the deposition testimony of Terence Gallagher, a former Pfizer attorney and member of Quigley's board of directors, stating that Quigley, after its 1968 acquisition by Pfizer, "was a separate corporation and subsidiary of Pfizer," that no Quigley employees held positions with Pfizer, and that the only Pfizer employees, who held positions with Quigley, were several high-ranking Pfizer employees who sat on Quigley's board of directors; the deposition testimony of Susan M. Raterman, C.I.H., an industrial hygienist and an expert witness for the Stein family, stating that, to her knowledge, "Quigley was responsible for manufacturing" Insulag; and the deposition testimony of three Bethlehem Steel employees, who had worked in the Brick Department and were responsible for purchasing the supplies used at the Sparrows Point plant, collectively asserting that Insulag was manufactured and sold by Quigley.

Moreover, in response to the Stein family's heavy reliance on and repeated references to the phrase: "Manufacturers of Refractory Products" and its placement on Quigley products beneath the trademarks of both Pfizer and Quigley, Pfizer presented an assortment of Quigley invoices and sales brochures, all of which bore dates preceding Quigley's acquisition by Pfizer, which displayed only the Quigley trademark, and which, nonetheless, stated: "Manufacturers of Refractory Products."

In ruling on the cross-motions for summary judgment, the circuit court, while acknowledging that the "documents that have been produced . . . do mention both names on the letterhead," stressed that "[t]hey don't say anything explicit about the manufacturer other than this phrase 'manufacturers of Insulag' . . . which is the logo that . . . Quigley had long used," that is, long before its acquisition by Pfizer.

The court further observed:

> I don't think a reasonable person could rely in any way, if that were required, upon Pfizer as the manufacturer . . . particularly given [the documents] were provided to sophisticated people involved in the industry.

The court then declared:

> I do not believe that a reasonable person under all the circumstances provided to me in this case could come to the conclusion from the documents that Pfizer was the manufacturer of the product.

### VI. Motion to Take Judicial Notice

During the pendency of this appeal, the Stein family filed, in this Court, a motion, requesting that we exercise our discretion, under Maryland Rule 5-201, and take judicial notice of additional documentary evidence, which, it claims, contradicts Pfizer's contention that, both before and after its 1968 acquisition of Quigley, the marketing and promotional materials of Quigley included the plural designation: "Manufacturers of Refractory Products." We decline to do so, as the Stein family does not claim that it did not have an

opportunity to present this evidence below. To do otherwise would run afoul of Maryland Rule 8-131(a), which confines the scope of our appellate review to matters which were before the circuit court.

## VII.  Standard of Review

A circuit court may grant summary judgment if there is "no genuine dispute as to any material fact," and "the party in whose favor judgment is entered is entitled to judgment as a matter of law." Md. Rule 2-501(f). In reviewing a circuit court's grant of summary judgment, we must construe all facts, as well as the inferences that may reasonably be drawn from those facts, in a light most favorable to the non-moving party, in this case, appellants. *May v. Air & Liquid Sys., Inc.*, 446 Md. 1, 8 (2015). Because a grant of summary judgment is predicated upon a ruling on a question of law and not a dispute of fact, our review is de novo. *Id.*

## VIII.  History of the "Apparent Manufacturer" Doctrine

Before proceeding any further with our analysis of the issues, we feel impelled to provide an account of the history of the "apparent manufacturer" doctrine, tracing its decisional evolution in the context of the successive *Restatements* issued by the American Law Institute, notably:  the *Restatement of Torts* ("the *First Restatement*"), then the *Restatement* (*Second*) *of Torts* ("the *Second Restatement*"), and finally, the *Restatement*

(*Third*) *of Torts:  Products Liability* ("the *Third Restatement*").  We believe that account will provide some helpful assistance in understanding the development and current nature and scope of the "apparent manufacturer" doctrine and thereby provide guidance in addressing the central question of this appeal:  whether Pfizer was an "apparent manufacturer" of Insulag.

**A.**

References to what was to become known as the "apparent manufacturer" doctrine first appeared in judicial decisions[8] of the early twentieth century.  By the 1930's, this doctrine had gained enough notoriety that it was included in the 1934 publication of the *First Restatement*, as Section 400, under the rubric:  "Vendor Selling as His Own Product Chattel Made by Another."  It asserted:

> One who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer.

*Restatement of Torts*, § 400 (1934).

That articulation of what was to be dubbed the "apparent manufacturer" doctrine confined the application of that doctrine to just sellers and distributors of goods or, in other words, only to those in the chain of distribution of the product in question, a constraint reaffirmed by comment a to that section, which defined, "one who puts out a chattel," as "any

---

[8]*Willson v. Faxon, Williams & Faxon*, 101 N.E. 799 (N.Y. 1913), and *Thornhill v. Carpenter-Morton Co.*, 108 N.E. 474 (Mass. 1915).

one who supplies it to others for their own use or for the use of third persons, either by sale or lease or by gift or loan." And a central feature of that doctrine, though unexpressed in the body of Section 400, was, according to comment c to Section 400 of the *First Restatement*, a buyer's reliance upon the care taken by the seller, who puts out a product as if it were his own. As that comment explained: "By putting a chattel out as his own product," a seller "causes it to be used in reliance upon his care in making it" and, consequently, is liable, as an "apparent manufacturer," if, "because of some negligence in its fabrication or through lack of proper inspection during the process of manufacture, the article is in a dangerously defective condition which the vendor could not discover after it was delivered to him." Or, as it was more succinctly put by the Supreme Court of Errors of Connecticut,[9] in a decision which cited a "Tentative Draft" of what would later become Section 400 of the *First Restatement*, a seller, by "putting out a chattel as his own product" and thereby "induc[ing] reliance," by the purchasing public, "upon his care in making it," is estopped from denying his identity as its manufacturer. *Burkhardt v. Armour & Co.*, 161 A. 385, 391 (Conn. 1932) (citation and quotation omitted).

The appellate decisions rendered during the early years of the "apparent manufacturer" doctrine either expressly or impliedly employed an objective "reliance" test, in determining whether an individual or entity should be deemed an "apparent manufacturer" for liability purposes. That is, the test was whether a reasonable consumer would have relied

---

[9]That court is now known as the Supreme Court of Connecticut.

upon a business's label or advertising materials in purchasing the product at issue. *See*, *e.g.*, *Swift & Co. v. Blackwell*, 84 F.2d 130, 132 (4th Cir. 1936); *Swift & Co. v. Hawkins*, 164 So. 231, 231-32 (Miss. 1935); *Slavin v. Francis H. Leggett & Co.*, 177 A. 120, 121 (N.J. Sup. Ct. 1935); *Burkhardt*, *supra*, 161 A. at 391; *Thornhill v. Carpenter-Morton Co.*, 108 N.E. 474, 491 (Mass. 1915); *Willson v. Faxon, Williams & Faxon*, 101 N.E. 799, 800-01 (N.Y. 1913).

And, at least one federal appellate court took "reliance" a step further and promulgated an "actual reliance" test. Under that test, a claimant must show not only that it was reasonable to rely upon the seller's representation that it was the "apparent manufacturer" of the defective product at issue but that he or she "actually" did so. *Carney v. Sears, Roebuck & Co.*, 309 F.2d 300, 304 (4th Cir. 1962) (applying Virginia law) (stating that "the basic test is whether or not the vendee reasonably believed in and relied upon the vendor's apparent manufacture of the product").

It is important to keep in mind, however, that, when the *First Restatement* was published, setting forth the "apparent manufacturer" doctrine, products liability law, at that time, differed from its current manifestation in two significant respects: First, actual manufacturers of defective products and mere non-manufacturing sellers of those products were not generally subject to the same tort rules; and, second, the doctrine of strict liability had not yet gained much currency.

Indeed, at the time that the *First Restatement* was issued, a non-manufacturing seller

of a defective product was usually (unless deemed an "apparent manufacturer") held to a

lesser duty than the manufacturer of that commodity. The general rule, then, was that, in the

"absence of misrepresentation or of negligence in the selection of goods, an intermediate

distributor [was] liable to a customer only for defects discoverable upon reasonable

inspection, unless he ha[d] represented that he was the actual manufacturer[.]" *Swift & Co.

v. Blackwell*, *supra*, 84 F.2d at 132. If he had, the *First Restatement* imposed a greater duty

on him than the duty placed on a non-manufacturing seller or distributor.

In other words, while an actual manufacturer of a chattel had a duty to warn potential

users of any danger that might arise from its intended use, *Restatement of Torts*, §§ 388,

394,[10] a non-manufacturing seller or distributor of that chattel generally did not. And,

although an actual manufacturer had a duty "to exercise reasonable care in the manufacture

of a chattel which, unless carefully made," presented "an unreasonable risk of causing

---

[10]Specifically, Section 394 of the *First Restatement* provided that "[t]he manufacturer of a chattel, which he knows to be, or to be likely to be, dangerous for use, is subject to liability as stated in §§ 388 to 390," where, among other things, a duty to warn others of the danger was imposed; and the ensuing Section 395 provided that a "manufacturer who fails to exercise reasonable care in the manufacture of a chattel which, unless carefully made, he should recognize as involving an unreasonable risk of causing substantial bodily harm to those who lawfully use it for a purpose for which it is manufactured and to those whom the supplier should expect to be in the vicinity of its probable use, is subject to liability for bodily harm caused to them by its lawful use in a manner and for a purpose for which it is manufactured." *Restatement of Torts*, §§ 394, 395.

substantial bodily harm" to its user, *Restatement of Torts*, § 395, a non-manufacturing seller or distributor of that chattel generally had no such duty.

But, when a non-manufacturing seller or distributor of a chattel was deemed an "apparent manufacturer," under Section 400 of the *First Restatement*, such a person or entity was held to the **same** duty of care borne by the actual manufacturer.[11] The scope of that liability was not, yet, however, extended to trademark licensors or other non-sellers. That extension did not occur until the 1970's, when, for the first time, trademark licensors were held to be, under certain circumstances, "apparent manufacturers."

Furthermore, at the time of the *First Restatement*, unlike today, tort liability of the supplier of a defective chattel, whether the supplier was an actual manufacturer, a

---

[11]The following is a sampling of cases where non-manufacturing sellers of defective goods were held to the same duty of care as an actual manufacturer, under the "apparent manufacturer" doctrine: *Willson v. Faxon, Williams & Faxon*, 101 N.E. 799 (N.Y. 1913); *Thornhill v. Carpenter-Morton Co.*, 108 N.E. 474 (Mass. 1915); *Tiedje v. Haney*, 239 N.W. 611 (Minn. 1931); *Burkhardt v. Armour & Co.*, 161 A. 385 (Conn. 1932); *Slavin v. Francis H. Leggett & Co.*, 177 A. 120 (N.J. Sup. Ct. 1935); *Swift & Co. v. Hawkins*, 164 So. 231 (Miss. 1935); *Swift & Co. v. Blackwell*, 84 F.2d 130 (4th Cir. 1936); *Dow Drug Co. v. Nieman*, 13 N.E.2d 130 (Ohio Ct. App. 1936); *Armour & Co. v. Leasure*, 177 Md. 393 (1939); *Gordy v. Pan American Petroleum Corp.*, 193 So. 29 (Miss. 1940); *Commoners of State Ins. Fund v. City Chem. Corp.*, 48 N.E.2d 262 (N.Y. 1945); *Chapman Chemical Co. v. Taylor, for use and benefit of Wilson*, 222 S.W.2d 820 (Ark. 1949); *Markel v. Spencer*, 171 N.Y.S.2d 770 (App. Div. 1958); *Rauch v. American Radiator & Standard San. Corp.*, 104 N.W.2d 607 (Iowa 1960); *Sears, Roebuck & Co. v. Morris*, 136 So. 2d 883 (Ala. 1961); *Carney v. Sears, Roebuck & Co.*, 309 F.2d 300 (4th Cir. 1962) (applying Virginia law); *Ford Motor Co. v. Mathis*, 322 F.2d 267 (5th Cir. 1963) (applying Texas law); *Putnam v. Erie City Mfg. Co.*, 338 F.2d 911 (5th Cir. 1964) (applying Texas law); *Standard Motor Co. v. Blood*, 380 S.W.2d 651 (Tex. Civ. App. 1964).

non-manufacturing seller, or an "apparent manufacturer," was predicated upon proof of some negligent act. *See Restatement of Torts*, §§ 394-398. In instances where an "apparent manufacturer" had not, itself, committed a negligent act, the plaintiff, in a tort-based products liability action, had to prove that someone in the distribution chain, typically the actual manufacturer, was negligent, as a prerequisite to the imposition of liability on an "apparent manufacturer."[12]

**B.**

When, in 1965, the *Restatement* (*Second*) *of Torts* ("the *Second Restatement*") was issued, it included a revised Section 400, which was nearly identical to its predecessor, Section 400 of the *First Restatement*. Comment d to Section 400 of the *Second Restatement*, in expounding upon the reliance-based rationale for the "apparent manufacturer" doctrine, which had been set forth in the *First Restatement*, explained that an "apparent manufacturer" "frequently" induces consumer reliance in two ways: by causing a chattel "to be used in reliance upon his care in making it"; and by causing a chattel "to be used in reliance upon a belief that he has required it to be made properly for him and that the actor's reputation is an

---

[12]An example of the application of this dated doctrine can be found in *Burkhardt v. Armour & Co.*, *supra*, 161 A. 385. There, a consumer suffered a mortal injury from eating the contents of a can of corned beef. Embedded in the beef was a thin piece of tin, which, when it was swallowed by that consumer, caused fatal lacerations to her esophagus. *Id.* at 387. Although the American distributor of that defective canned food product was held liable to the decedent consumer's estate, as an "apparent manufacturer," that liability was based upon the negligence of the Argentinian packer of the defective product. *Id.* at 391. *Accord Thornhill v. Carpenter-Morton Co.*, 108 N.E. 474 (Mass. 1915); *Willson v. Faxon, Williams & Faxon*, 101 N.E. 799 (N.Y. 1913).

assurance to the user of the quality of the product." *Restatement* (*Second*) *of Torts*, § 400, cmt. d (1965).

While leaving largely undisturbed the explication of the "apparent manufacturer" doctrine that appeared in the *First Restatement*, the *Second Restatement* broke new ground by adding Section 402A, entitled "Special Liability of Seller of Product for Physical Harm to User or Consumer," to its text, which extended the liability of sellers by prescribing a doctrine of strict liability as to those in the chain of distribution. Specifically, it stated that "[o]ne who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property" was liable for any physical harm caused by that condition to "the ultimate user or consumer, or to his property," even when "the seller ha[d] exercised all possible care in the preparation and sale of his product."[13] Or, as expressed in comment f to

_____

[13]In its entirety, Section 402A provides:

> (1) One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
>
> (a) the seller is engaged in the business of selling such a product, and
>
> (b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.
>
> (2) The rule stated in Subsection (1) applies although
>
> (a) the seller has exercised all possible care in the preparation and sale of his product, and

Section 402A, strict liability "applies to any person engaged in the business of selling products for use or consumption," including "any manufacturer of such a product" as well as "any wholesale or retail dealer or distributor." *Restatement* (*Second*) *of Torts*, § 402A, cmt. f.

During the decade that followed the publication of the *Second Restatement*, most state appellate courts that addressed this issue[14] adopted the strict liability doctrine of Section 402A. Those states were joined by Maryland's Court of Appeals, in *Phipps v. General Motors Corp.*, 278 Md. 337, 346, 352-53 (1976), where our highest Court adopted both Section 402A and its "official comments" as part of Maryland common law. Thereafter, in all jurisdictions that had adopted Section 402A (including Maryland), strict products liability

---

(b) the user or consumer has not bought the product from or entered into any contractual relation with the seller.

[14]In *Greenman v. Yuba Power Products, Inc.*, 377 P.2d 897 (Cal. 1963), a seminal decision, rendered several years before the publication of the *Second Restatement*, the Supreme Court of California adopted the doctrine of strict liability as to a manufacturer of a defective product, whose malfunction resulted in personal injury to its user. After publication of the *Second Restatement*, which, relying in part upon *Greenman*, extended strict liability to all sellers "engaged in the business of selling" products, most state appellate courts followed suit and adopted Section 402A. *See*, *e.g.*, *O. S. Stapley Co. v. Miller*, 447 P.2d 248 (Ariz. 1968); *Hiigel v. General Motors Corp.*, 544 P.2d 983 (Colo. 1975); *Garthwait v. Burgio*, 216 A.2d 189 (Conn. 1965); *West v. Caterpillar Tractor Co., Inc.*, 336 So. 2d 80 (Fla. 1976); *Suvada v. White Motor Co.*, 210 N.E.2d 182 (Ill. 1965); *Ayr-Way Stores, Inc. v. Chitwood*, 300 N.E.2d 335 (Ind. 1970); *McCormack v. Hankscraft Co.*, 154 N.W.2d 488 (Minn. 1967); *Rosenau v. City of New Brunswick*, 238 A.2d 169 (N.J. 1968); *Keener v. Dayton Elec. Mfg. Co.*, 445 S.W.2d 362 (Mo. 1969); *Codling v. Paglia*, 298 N.E.2d 622 (N.Y. 1973); *Lonzrick v. Republic Steel Corp.*, 218 N.E.2d 185 (Ohio 1966); *Webb v. Zern*, 220 A.2d 853 (Pa. 1966); *McKisson v. Sales Affiliates, Inc.*, 416 S.W.2d 787 (Tex. 1967).

was imposed on all entities in the distribution chain of a defective product, from the manufacturer to the retail seller.

That development, some courts and commentators believed, called into question whether the "apparent manufacturer" doctrine retained any relevance, since the strict liability of Section 402A appeared to now "provide a remedy for consumers injured by unsafe products," which was the "aim" of the "apparent manufacturer" doctrine. *Heel v. Sherman Equip.*, 442 N.E.2d 199, 202 (Ill.1982); *see* David G. Owen and Mary J. Davis, 2 *Owens & Davis on Products Liability*, § 16:15, at 636 (4th ed. 2014).[15]

But, in the years following the widespread adoption of strict products liability, the "apparent manufacturer" doctrine did not fall into desuetude. In fact, state and federal courts began to apply that doctrine to entities outside the chain of distribution of defective products,

_____

[15]In *Hebel v. Sherman Equip.*, 442 N.E.2d 199 (1982), the Supreme Court of Illinois noted that the "imposition of tort liability based on a defendant's status as the 'apparent manufacturer' of a harm-causing product predate[d] by some years the advent of the doctrine of strict liability in tort of suppliers of unreasonably unsafe chattels." *Id.* at 201. Then, observing that the "aim of the ['apparent manufacturer'] doctrine clearly was to provide a remedy for consumers injured by unsafe products," an "objective [now] achieved by the doctrine of strict products liability," it went on to declare that the "function of the apparent-manufacturer doctrine has, as it were, been absorbed by the theory of sellers' strict liability in tort for injuries caused by unreasonably unsafe products." *Id.* at 202.

Some commentators agreed. In 2 *Owens & Davis on Products Liability*, § 16:15, at 636 (4th ed. 2014), the authors of that text opined that, in light of "the fall of the privity defense, the spread of effective discovery techniques for uncovering both the identity and production methods of manufacturers, and, most importantly, the adoption of a general doctrine of strict products liability in tort," the "apparent manufacturer" doctrine became "quaintly obsolete."

such as trademark licensors.[16]  In so doing, those courts frequently relied upon comment d

to Section 400 of the *Second Restatement*, which first appeared as a 1948 revision to the *First*

*Restatement*.  It provided in part:

> The actor puts out a chattel as his own product in two types of
> cases.    The first is where the actor appears to be the
> manufacturer of the chattel.  The second is where the chattel
> appears to have been made particularly for the actor.  In the first
> type of case the actor frequently causes the chattel to be used in
> reliance upon his care in making it; in the second, he frequently
> causes the chattel to be used in reliance upon a belief that he has
> required it to be made properly for him and that the actor's
> reputation is an assurance to the user of the quality of the
> product. . . .  Thus, **one puts out a chattel as his own product**
> **when he puts it out under his name or affixes to it his trade**
> **name or trademark.**  When such identification is referred to on
> the label as an indication of the quality or wholesomeness of the
> chattel, there is an added emphasis that the user can rely upon
> the reputation of the person so identified.

*Restatement* (*Second*) *of Torts*, § 400 cmt. d (emphasis added).  In sum, comment d

seemingly imposed "apparent manufacturer" liability on one who "affixes to [a defective

product] his trade name or trademark," regardless of whether that individual or entity played

no role in the manufacture or distribution of that product.

Thereafter, judicial decisions considering the applicability of the "apparent

manufacturer" doctrine, under Section 400 of the *Second Restatement*, to trademark licensors

---

[16]*See, e.g.*, *Carter v. Joseph Bancroft & Sons Co.*, 360 F. Supp. 1103, 1107 (E.D.
Pa.1973); *Connelly v. Uniroyal, Inc.*, 389 N.E.2d 155, 161, 163 (Ill. 1979); *Brandimarti v.
Caterpillar Tractor Co.*, 527 A.2d 134 (Pa. Super. Ct. 1987).

fell "roughly into three categories"[17]: (1) decisions "holding that a non[-]seller trademark licensor could be held liable as an apparent manufacturer if it exercised substantial control over the production of the product"[18]; (2) decisions "holding that a non[-]seller trademark licensor may be held liable as an apparent manufacturer, despite having had little or no participation in the design or manufacture of a product, by reason of the likelihood that buyers or users of the product would rely on the trademark as an assurance of the product's quality"[19]; and (3) decisions "which declined to hold trademark licensors liable under the apparent manufacturer doctrine in circumstances in which they had little or no involvement in the design or manufacture of the product."[20] As we shall see, in the following subsection

---

[17]*See Lou v. Otis Elevator Co.*, 933 N.E.2d 140, 147 (Mass. App. Ct. 2010).

[18]*See, e.g., Connelly v. Uniroyal, Inc.*, 389 N.E.2d 155, 161, 163 (Ill. 1979) (holding that a trademark licensor could be found liable as an "apparent manufacturer" of a defective tire where the licensor was not in the distribution chain but owned 95 per cent of the shares of the actual manufacturer, and the actual manufacturer followed "detailed information as to the [manufacturing] methods, processes and formulas" provided by the licensor).

[19]*See, e.g., Carter v. Joseph Bancroft & Sons Co.*, 360 F. Supp. 1103, 1107 (E.D. Pa.1973) (imposing "apparent manufacturer" liability upon a trademark licensor where it permitted the actual manufacturer to state on its "label that the article was made according to specifications and quality standards prescribed and controlled by [the licensor]"); *Brandimarti v. Caterpillar Tractor Co.*, 527 A.2d 134 (Pa. Super. Ct. 1987) (holding that a trademark licensor could be liable as an "apparent manufacturer" of a defective forklift, actually manufactured by its subsidiary, based upon its decision to "permit its name to appear on the equipment," thereby inducing "others to purchase the product in reliance on the skill and reputation associated with [its] name").

[20]*See, e.g., Harrison v. B.F. Goodrich Co.*, 881 So.2d 288 (Miss. Ct. App. 2004); *Burkert v. Petrol Plus of Naugatuck, Inc.*, 579 A.2d 26 (Conn. 1990); *Hebel v. Sherman Equip.*, 442 N.E.2d 199, 202 (Ill.1982).

-24-

of this opinion, application of the "apparent manufacturer" doctrine to trademark licensors led to the development of an alternative test, for determining whether a non-selling defendant should be deemed an "apparent manufacturer," in a products liability action, namely, the "enterprise liability" test.

## C.

In 1998, the "apparent manufacturer" doctrine was presented, in a slightly modified form, in the *Restatement* (*Third*) *of Torts:  Products Liability* (hereinafter "the *Third Restatement*"), in Section 14, which is entitled "Selling or Distributing as One's Own a Product Manufactured by Another."  That section states, in pertinent part:

> One engaged in the business of selling or otherwise distributing products who sells or distributes as its own a product manufactured by another is subject to the same liability as though the seller or distributor were the product's manufacturer.

The authors of the *Third Restatement* acknowledged that the adoption of strict liability, in the years following the publication of the *Second Restatement*, called into question the continued vitality of the "apparent manufacturer" doctrine, noting that

> [a]fter inclusion of § 402A in the Restatement, Second, imposing strict liability on all commercial sellers of defective products for harm caused by product defects, it was questionable whether § 400 remained relevant in the context of products liability.  Once § 402A imposed strict liability on all product sellers it made little, if any, difference whether the seller of a defective product was a retailer or a manufacturer.

*Restatement* (*Third*) *of Torts:  Products Liability*, § 14, cmt. a (1998).

Nonetheless, comment c to Section 14, largely echoing the comments to Section 400 of the *First* and *Second Restatements*,[21] which we have previously discussed, appeared to retain the rationale, if not the test, of "consumer reliance," as to non-manufacturing sellers of defective products. Comment c to Section 14 provides that, when "a commercial seller sells a product manufactured by another under its own trademark or logo, the seller is liable as though it were the manufacturer of the product" because "the seller is presumed to cause the product to be used or consumed, in part at least, in reliance on the seller," or, in other words, the "seller's reputation is an implied assurance of the quality of the product[.]"

Recognizing, however, that some courts had begun to apply the "apparent manufacturer" doctrine to entities outside the chain of distribution of defective products, the drafters of the *Third Restatement* attempted to clarify, in comment d to Section 14, when non-sellers, specifically trademark licensors, may be held liable for defective products, under an "apparent manufacturer" theory:

> *d. Liability of trademark licensors.* The rule stated in this Section does not, by its terms, apply to the owner of a trademark who licenses a manufacturer to place the licensor's trademark or logo on the manufacturer's product and distribute it as though manufactured by the licensor. In such a case, even if purchasers of the product might assume that the trademark owner was the manufacturer, the licensor does not "sell or distribute as its own a product manufactured by another." Thus, the manufacturer

---

[21] *See Restatement of Torts*, § 400, cmt. c; *Restatement* (*Second*) *of Torts*, § 400, CMT. d.

may be liable under §§ 1- 4,[22] but **the licensor, who does not sell or otherwise distribute products, is not liable under this Section of this Restatement.**

**Trademark licensors are liable for harm caused by defective products distributed under the licensor's trademark or logo when they participate substantially in the design, manufacture, or distribution of the licensee's products. In these circumstances they are treated as sellers of the products bearing their trademarks.**

(Emphasis added.)

A cursory reading of comment d could easily lead to the mistaken conclusion that it has abandoned "reliance," either as a rationale underlying the "apparent manufacturer" doctrine or as a test for determining its applicability to a particular defendant. Because, however, the very premise of comment d is its applicability to trademark licensors, that comment, by implication, incorporates "reliance," to a limited extent. For, as has long been recognized, consumers have come "to rely more and more upon trademarks and tradenames as symbols of quality and guaranties of satisfaction." Frank I. Schechter, *The Rational Basis of Trademark Protection*, 40 Harv. L. Rev. 813, 824 (Apr. 1927).

Consumer reliance upon trademarks as symbols of product quality, in turn, supplies the underlying rationale for imposition of "apparent manufacturer" liability on what is, after

---

[22]Sections 1 through 4 of the *Third Restatement* set forth the general rules of products liability. Although it is not directly relevant to this case, we feel impelled to note that the Court of Appeals has expressly disapproved Section 2 and has declined to adopt it as the law of Maryland, choosing instead to retain Section 402A of the *Second Restatement*, including its "consumer expectations" test, in all strict products liability actions in Maryland. *Halliday v. Sturm, Ruger & Co.*, 368 Md. 186, 193-209 (2002).

all, a class of non-selling defendants, that is, trademark licensors. As one commentator has explained it, the "apparent manufacturer" doctrine, as applied to trademark licensors, "focuses on what the trademark owner did to induce consumers to believe that the trademark owner actually manufactured the goods in question and purchase those goods in reliance on this specific belief." David J. Franklyn, *The Apparent Manufacturer Doctrine, Trademark Licensors and the Third Restatement of Torts*, 49 Case W. Res. L. Rev. 671, 693 (Summer, 1999).

But, while comment d has not abandoned the "reliance" rationale underlying the "apparent manufacturer" doctrine, it does represent a shift "away from the earlier emphasis on a consumer's reliance on the presence of a trademark as indicative of 'an assurance of quality,' in favor of an approach that focuses on whether the trademark owner in fact actively worked to assure the quality of the trademarked product." Erin K. Higgins, *What's in a Name? Possibly, Strict Liability as an Apparent Manufacturer*, 78 Def. Couns. J. 355, 359 (July 2011). Its test, for determining whether a trademark licensor should be deemed an "apparent manufacturer," focuses on the licensor's participation "in the design, manufacture, or distribution of the licensee's products" and is predicated on what has been designated the "enterprise liability" test, according to which "a trademark licensor may be held vicariously liable for the torts of its licensee if the licensor is a 'significant participant' in the overall enterprise that places a defective product into the stream of commerce." Franklyn, *supra*, at

706. It thereby focuses "almost entirely on the licensor's control over, or involvement in, its licensee's affairs." *Id.*

## IX. The Tests for Determining Whether an Entity is an "Apparent Manufacturer" and Their Application to the Instant Case

As our review of the history of the "apparent manufacturer" doctrine has shown, three tests for determining whether an entity may be found to be an "apparent manufacturer" have emerged from the caselaw: "objective" reliance test, "actual" reliance test, and what has been described as the "enterprise liability" test, as set forth in comment d to Section 14 of the *Third Restatement*. Unfortunately, the only two Maryland decisions, *Armour & Co. v. Leasure*, 177 Md. 393 (1939), and *Telak v. Maszczenski*, 248 Md. 476 (1968), that address the "apparent manufacturer" doctrine do not designate a specific test to be applied.[23] But, on the other hand, no matter which of the three tests we employ, we reach the same result: Pfizer cannot be deemed an "apparent manufacturer" of Insulag, under the facts of this case.

---

[23]In *Armour & Co. v. Leasure*, 177 Md. 393 (1939), the Court of Appeals, in two sentences and without analysis, merely stated that the non-manufacturing American distributor of the defective product at issue "put it out as its own product, and thereby became subject to the same liability as though it were the original manufacturer." *Id.* at 412 (citing *Restatement of Torts*, § 400). And, in *Telak v. Maszczenski*, 248 Md. 476 (1968), where the identity of the actual manufacturer of the purportedly defective product at issue was "unmistakably clear," the Court of Appeals held that "apparent manufacturer" liability could not be imposed on a non-manufacturing seller of that product. *Id.* at 487.

## A. "Objective" Reliance Test

A majority of state and federal appellate courts that have considered this question have applied an objective test in determining reliance, that is, whether a reasonable consumer would have relied upon a label or advertising materials of a product in purchasing it. An early statement of this test appeared in *Swift & Co. v. Blackwell*, *supra*, 84 F.2d at 132, where the United States Court of Appeals for the Fourth Circuit held that a wholesaler of a defective can of evaporated milk was liable as an "apparent manufacturer" because "the average reader would certainly conclude from a perusal of the label that the goods in the can were the product of" the wholesaler. *See also Burkhardt*, *supra*, 161 A. at 391 (upholding trial court's finding that "the ordinary, reasonable person reading this label would have inferred that Armour & Co. was the packer of the product"); *accord Hebel v. Sherman Equip.*, *supra*, 442 N.E.2d 199 (Ill. 1982); *Markel v. Spencer*, 171 N.Y.S.2d 770 (App. Div. 1958); *Chapman Chemical Co. v. Taylor, for use and benefit of Wilson*, 222 S.W.2d 820 (Ark. 1949); *Commn'rs of State Ins. Fund v. City Chem. Corp.*, 48 N.E.2d 262 (N.Y. 1945); *Swift & Co. v. Hawkins*, *supra*, 164 So. 231 (Miss. 1935); *Slavin v. Francis H. Leggett & Co.*, *supra*, 177 A. 120 (N.J. Sup. Ct. 1935).

In applying the "objective" reliance test to the facts of the instant case, we must consider the question whether, in doing so, we should view reliance from the vantage point of an ordinary, reasonable consumer or from the perspective of a reasonable purchaser, in the

position of the actual purchaser. As there are no Maryland appellate decisions directly on point, we turn to the decision of the Supreme Court of Illinois, in *Hebel v. Sherman Equipment*, *supra*, 442 N.E.2d 199, for assistance, as it involved a very similar set of circumstances. That Illinois case, like the case before us, dealt with the purchase of a defective product by a commercial entity and not by a consumer, which factually distinguishes it, and the instant case, from the vast majority of "apparent manufacturer" cases. That, of course, is not surprising because, as the Illinois Supreme Court observed, the "apparent manufacturer" doctrine "was developed in the context of suits by consumers against sellers of dangerous chattels," and "[nearly all the cases imposing liability on this basis involved] defendants who were retailers or distributors." *Id.* at 202.

Rohn Hebel was sixteen years old when, while working at the Glenwood Standard Service Station and Car Wash, his foot was caught in a "conveyor," a component of the service station's car-washing apparatus. He subsequently brought a products liability suit against Sherman Industries, Inc., a manufacturer of automatic car-washing machinery (which we shall hereafter refer to as "Sherman Equipment"), alleging that the "car washing machine," at the Glenwood station, had been "designed, manufactured and sold by Sherman [Equipment] and that it was in a defective and unreasonably dangerous condition." *Id.* at 200.

The Glenwood station had, in fact, purchased all of its car-washing equipment from a distributor of automotive cleaning machinery, Haverberg Auto Laundry Equipment

Company. That company, in turn, had obtained "nearly all" of its equipment from Sherman Equipment (whose products it regularly distributed), except for the "conveyor" at issue, which it had, itself, designed and manufactured. *Id.* at 200-01. As it was undisputed that Sherman Equipment did not manufacture the defective conveyor, Hebel claimed that, since all of the other car-washing equipment prominently displayed Sherman Equipment's trade name and trademark, it should be deemed an "apparent manufacturer" of the entire apparatus, including the defective conveyor. *Id.* at 201.

Nonetheless, the Supreme Court of Illinois found that Sherman Equipment was not an "apparent manufacturer" of the purportedly defective conveyor as it had not held itself out to the public "as the manufacturer of Haverberg's conveyor." *Id.* at 203. The "primary rationale for imposing liability on the apparent manufacturer of a defective product," explained the Illinois court, "is that it has induced the *purchasing public* to believe that it is the actual manufacturer, and to act on this belief—that is, *to purchase the product in reliance* on the apparent manufacturer's reputation and skill in making it." *Id.* (citing *Restatement* (*Second*) *of Torts*, § 400 cmt. d). Therefore, "whether a holding out has occurred must be judged from the viewpoint of the purchasing public, and **in light of circumstances as of the time of purchase**," declared that court. *Id.* (emphasis added).

Illinois's highest court, consequently, rejected the claim that the proper frame of reference was a "reasonable person in [Hebel's] position," observing:

> It is clear, and [Hebel] does not seriously dispute, that the various car-washing machines made by Sherman [Equipment],

-32-

as well as the conveyor made by Haverberg, were individual pieces of equipment which were purchased and sold as separate items, and apparently also were operated independently of one another. **That a casual observer, viewing the machines after their purchase and installation, might think otherwise does not mean that a reasonable purchaser of car-washing equipment, such as Glenbrook, would rely on such an impression. . . . . The mere fact that [Sherman Equipment's] machines, which bore its name, were sold by Haverberg and used by Glenbrook in conjunction with a separate, unlabeled piece of equipment does not, we think, identify Sherman [Equipment] in the mind of the reasonable purchaser as the maker of the unlabeled machine**, or render Sherman [Equipment] liable for injuries caused by it under the apparent-manufacturer rule.

*Id.* (emphasis added).

Applying the sound reasoning of *Hebel*, we conclude that, to prevail in this case, under the "objective" reliance test, the Stein family must show that a reasonable purchaser of refractory materials, that is, Bethlehem Steel, during the time period from 1968 to 1974, would have relied upon Pfizer's reputation and assurances of quality in purchasing the refractory material at issue, namely, Insulag. "That a casual observer" might have believed that Pfizer was the manufacturer of Insulag "has no bearing on the issue" before us.[24] *Id.*

---

[24]But we hasten to add that, in an "apparent manufacturer" case involving a consumer product, the rule enunciated in the instant case becomes, as a practical matter, merely a question of whether an ordinary, reasonable consumer purchaser would have relied upon a reputed "apparent manufacturer's" reputation and assurances of quality in deciding whether to purchase the product at issue. The rule, in the instant case, is different precisely because the product at issue was not a consumer product, that is, a product "used or bought for use primarily for personal, family, or household purposes." Md. Code (1975, 2013 Repl. Vol.), Commercial Law Article, § 9-102(23). Furthermore, it was purchased by a sophisticated user.

It is clear that, under the "objective" reliance test, the Stein family's claim fails. Given that Bethlehem Steel was unquestionably a sophisticated purchaser of Insulag and that Insulag was not a consumer product, we believe that no reasonable fact finder could conclude that a reasonable person, in the position of a Bethlehem Steel purchasing manager during the period from 1968 through 1974, who had purchased Insulag for decades from Quigley, could have purchased Insulag in reliance upon Pfizer's reputation and assurances of quality. Rather, it is manifest that Bethlehem Steel knew, at all relevant times, that it was purchasing Insulag from Quigley, not Pfizer. *See Telak*, *supra*, 248 Md. at 487 (holding that, where the identity of the actual manufacturer of a product was "unmistakably clear," a wholesale distributor of that product cannot be deemed an "apparent manufacturer").

## B. Actual Reliance Test

At least one court, in determining whether a defendant is an "apparent manufacturer," has applied an "actual reliance" test, under which a plaintiff must prove that he or she actually and reasonably relied upon the reputed "apparent manufacturer's" trademark, reputation, or assurances of product quality, in purchasing the defective product at issue. *Carney v. Sears, Roebuck & Co.*, *supra*, 309 F.2d 300, 304 (4th Cir. 1962).

Because, in *Carney*, the plaintiff was also the purchaser of the defective product at issue, the appellate court did not have to consider whether it is the plaintiff's actual reliance or the purchaser's that is dispositive. In the instant case, regardless of whether we apply the "actual reliance" test from the perspective of the plaintiff (that is, the user) or the wholesale

-34-

purchaser, the end result is the same. If we assume that it is the user's perspective that governs, then, given the total absence of any mention, by the decedent in his 1987 deposition testimony, of any use of or exposure to Insulag, or any mention whatsoever of Pfizer, it is clear that there was no reliance by the decedent sufficient to deem Pfizer the "apparent manufacturer" of that product.

If, on the other hand, we assume that the purchaser's perspective governs the application of the "actual reliance" test, then the Stein family's claim fares no better, as the only evidence establishes that Bethlehem Steel had purchased Insulag directly from Quigley for many years before its acquisition by Pfizer and that, after that corporate acquisition, it continued to do so without interruption. Nor was any evidence adduced that Bethlehem Steel actually relied upon Pfizer's trademark, reputation, or assurances of quality, in deciding to purchase Insulag, and therefore, the Stein family's "apparent manufacturer" claim must fail, regardless of whose "reliance" we focus on.

## C. "Enterprise Liability" Test

A few courts have not appeared to require that a plaintiff, raising an "apparent manufacturer" claim, show any reliance upon the defendant's reputation or assurances of quality, applying instead the "enterprise liability" test, that is, whether the defendant "participate[d] substantially in the design, manufacture, or distribution" of the defective product at issue, *Restatement* (*Third*) *of Torts:  Products Liability*, § 14, cmt. d, provided, of

course, that the defendant's trademark appeared on that product.[25]  For example, in *Lou v. Otis Elevator Co.*, 933 N.E.2d 140 (Mass. App. Ct. 2010), the Appeals Court of Massachusetts affirmed the imposition of "apparent manufacturer" liability on a trademark licensor, because there was sufficient evidence that it "participated substantially in the design or manufacture of" the defective product at issue. *Id.* at 147-50.[26]  *Accord Connelly v. Uniroyal, Inc.*, 389 N.E.2d 155, 161, 163 (Ill. 1979) (imposing liability on trademark licensor because such a licensor "is an integral part of the marketing enterprise, and its participation in the profits reaped by placing a defective product in the stream of commerce presents the same public policy reasons for the applicability of strict liability which supported the imposition of such liability on wholesalers, retailers and lessors") (internal citation omitted); *Bathory v. Proctor & Gamble Distrib. Co.*, 306 F.2d 22 (6th Cir. 1962) (applying Michigan law[27]) (imposing liability on marketing subsidiary of manufacturing corporation, reasoning that "one department of a manufacturing and selling enterprise which puts a dangerous product into the channels of trade [cannot] escape liability by saying that it did not know

[25]As we observed earlier, during our explication of the history of the "apparent manufacturer" doctrine, "reliance," under this theory of the "apparent manufacturer" doctrine, serves merely as the rationale, not the test, for its applicability.

[26]The defective product at issue, in that case, an escalator in which the plaintiff's "hand became trapped," "prominently" bore the defendant's trademark but "no other trade name or mark." *Lou v. Otis Elevator Co.*, *supra*, 933 N.E.2d at 142-43.

[27]We note that, more than thirty years after the decision in *Bathory* was rendered, the Supreme Court of Michigan declined "to supplement [its] current products liability jurisprudence with the apparent-manufacturer doctrine." *Seasword v. Hilti, Inc.*, 537 N.W.2d 221, 224 (Mich. 1995).

what another department of such an integrated operation was doing"). *See also Watson v. Dillon Cos.*, 797 F. Supp. 2d 1138, 1162 (D. Colo. 2011) (applying Colorado law) (declining to decide whether reliance is an element of an "apparent manufacturer" claim).[28]

As noted earlier, the "enterprise liability" test, as articulated in the *Third Restatement*, applies only to trademark licensors. In the instant case, there was no trademark licensing agreement between Pfizer and Quigley, and thus, it would appear that the "enterprise liability" test is inapplicable. But even if their relationship were deemed analogous to that between a trademark licensor and its licensee, given that, once Pfizer had acquired Quigley and, thereafter, throughout the relevant time period, from 1968 to 1974, Pfizer's trademark appeared on advertisements and promotional materials for Insulag, as well as invoices, from sales of Insulag, issued by Quigley, Pfizer would not qualify as an "apparent manufacturer," under that test, because there is no evidence that it participated "substantially" in the design, manufacture, or distribution of Insulag. According to the "enterprise liability" test:

---

[28]We make one additional observation regarding the "enterprise liability" test. Several of the cases, cited by the *Lou* Court, supporting that test, 933 N.E.2d at 147, did not actually consider, expressly or impliedly, the "apparent manufacturer" doctrine, in holding that trademark licensors could be strictly liable for defective products, which bore their trademarks, provided that those licensors were substantially involved in placing such products into the stream of commerce. *See, e.g.*, *Torres v. Goodyear Tire & Rubber Co.*, 786 P.2d 939, 945 (Ariz.1990) (imposing liability on trademark licensor, under "enterprise liability" theory, reasoning that "the brain that so competently and thoroughly directs the entire enterprise must be liable for the acts of its appendages"); *Kasel v. Remington Arms Co.*, 101 Cal. Rptr. 314, 322 (Cal. Ct. App. 1972) (imposing strict liability on American ammunition manufacturer for harm caused by defective shotgun shell, manufactured by Mexican affiliate, because American company "was an integral part of the composite business enterprise which placed the defective shell in the stream of commerce").

> Trademark licensors are liable for harm caused by defective products distributed under the licensor's trademark or logo when they participate substantially in the design, manufacture, or distribution of the licensee's products. In these circumstances they are treated as sellers of the products bearing their trademarks.

*Restatement* (*Third*) *of Torts: Products Liability*, § 14, cmt. d.

The Stein family asserts that the invoices and promotional materials, issued by Quigley after its acquisition by Pfizer, indicating that both Pfizer and Quigley were "Manufacturers of Refractory Products," create a jury question of whether Pfizer participated "substantially" in the distribution of Insulag and that, indeed, we should regard Pfizer as a seller of that asbestos-containing product. They attempt to bolster that assertion with the observation that, after Pfizer's acquisition of Quigley, certain Pfizer sales reports and Securities and Exchange Commission ("SEC") filings included information regarding Quigley's sales of Insulag.

Although Pfizer's trademark appeared on Quigley's invoices and promotional materials, no evidence was presented that Pfizer participated "substantially [or for that matter, at all] in the design, manufacture, or distribution of" Insulag. For one thing, the Stein family's assertion that the description, "Manufacturers of Refractory Products," on Quigley's invoices and promotional materials, in combination with the depiction of both Quigley's and Pfizer's trademarks, suggests that Pfizer was holding itself out as a manufacturer of Insulag, is refuted by the simple observation that, before its acquisition by Pfizer, Quigley issued substantially similar documents, with only its own trademark, but nonetheless stated:

-38-

"Manufacturers of Refractory Products." Moreover, the invoices and promotional materials indicated no more than that Quigley was a subsidiary of Pfizer, and, as for the reports and SEC filings, it would be expected that a corporate parent would account for the sales of its subsidiaries, and, indeed, Pfizer was legally obligated to do so in its SEC filings.

All of the other evidence indicates, however, that, both before and after its acquisition by Pfizer, Quigley manufactured and designed Insulag and sold it to Bethlehem Steel, without any significant participation by Pfizer. That evidence established that Quigley shipped that product directly to Bethlehem Steel, that Pfizer did not design, manufacture, or distribute Insulag, and that Insulag was manufactured by Quigley long before its acquisition by Pfizer.

Finally, even after construing all of the facts, as well as the inferences that may reasonably be drawn from those facts, in a light most favorable to the Stein family, *May v. Air & Liquid Sys., Inc.*, *supra*, 446 Md. at 8, we conclude that the Stein family has failed to make its case that, under any of the three aforementioned tests, Pfizer should be deemed an "apparent manufacturer" of Insular. Accordingly, we affirm the circuit court's grant of summary judgment.

**MOTION TO TAKE JUDICIAL NOTICE DENIED. JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED. COSTS TO BE PAID BY APPELLANTS.**