STEPHENS, J.
¶ 1 This case presents a question of first impression: whether Washington should adopt the so-called "apparent manufacturer" doctrine for common law product liability claims predating the 1981 product liability and tort reform act (WPLA), ch. 7.72 RCW. As set forth in the Restatement (Second) of Torts § 400 (Am. Law Inst. 1965), this doctrine provides that "[o]ne who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer." Today, we join the clear majority of states that have formally adopted the apparent manufacturer doctrine. Applying the doctrine to the facts of this case, we hold that genuine issues of material fact exist as to whether a reasonable consumer could believe that Pfizer was a manufacturer of the asbestos products that caused Vernon Rublee's illness and death. We reverse the Court of Appeals.
FACTS AND PROCEDURAL HISTORY
¶ 2 Margaret Rublee is the surviving spouse of Vernon Rublee and the personal *1210 representative of Vernon's estate.[1] Vernon died of mesothelioma in 2015. Vernon was exposed to asbestos products while working as a machinist at Puget Sound Naval Shipyard (PSNS) between 1966 and 1980. As a machinist, Vernon worked on steam turbines that were insulated with asbestos "lagging." Clerk's Papers (CP) at 866. PSNS workers periodically "de-lagged" the turbines, removing the existing insulation and replacing it with new insulation cement. Id. The de-lagging process involved pouring bags of insulation cement (commonly called refractories) into buckets or troughs, mixing in water, and stirring the insulation cement mixture with a trowel or hoe. This process created dust that lingered around the workplace, both when the cement was poured from the bag and when it was mixed, exposing PSNS workers to asbestos. Id. at 867.
¶ 3 In the 1960s and early 1970s, PSNS workers used two insulation cement products on the steam turbines-Insulag and Panelag. Vernon, as well as other PSNS workers, observed the name "Pfizer" printed on the product bags. Id. at 869-70. In fact, Quigley-not Pfizer-actually manufactured, sold, and distributed the products. Founded in 1916, Quigley made and sold refractory products for use in steel plants, power plants, and refineries. Quigley trademarked Insulag in 1936 and Panelag in 1945. Id. at 87, 89. Insulag and Panelag contained asbestos until 1974, when Quigley discontinued the sale of both products and replaced them with asbestos-free alternatives. Id. at 97.
¶ 4 Pfizer was founded in 1849 as a manufacturer of pharmaceutical products. Over the next century, Pfizer expanded its product line to chemicals, as well as agricultural and industrial products. In 1968, seeking to "establish[ ] a position in refractory specialties," Pfizer acquired all of Quigley's capital shares and Quigley became a wholly owned subsidiary of Pfizer. Id. at 950.
¶ 5 According to Pfizer, following the acquisition, Quigley continued to do business as it had always done (until the asbestos products were discontinued in 1974). Resp't Pfizer Inc.'s Suppl. Br. at 4. Quigley operated the facility where Insulag and Panelag were manufactured and purchased the raw materials for both products from distributors. Quigley continued to handle sales and distribution of Insulag and Panelag by maintaining its own sales employees and receiving and filling customer orders. And, Quigley sales employees communicated with purchasers and distributors on Quigley stationery and signed letters on behalf of Quigley.
¶ 6 There was, however, one undeniable change following Pfizer's acquisition of Quigley. Following the acquisition, marketing and packaging materials for Insulag and Panelag were reconfigured to include reference to Pfizer. For example, on advertising fliers and other promotional materials, the Pfizer and Quigley logos appeared side by side, with the plural "Manufacturers of Refractories" printed below. CP at 952, 1028. Quigley sales employees distributed pocket calendars to customers that included both the Pfizer and Quigley logos. Id. at 965-66. Quigley's stationery stated that Quigley was a "Subsidiary of PFIZER, INC." and included a Pfizer logo in the upper left comer. Id. at 963. Pfizer's logo also appeared in the top left comer of Quigley's invoices for Insulag and Panelag, and the technical data sheets for both products were changed to include the Pfizer logo above "Quigley Company Inc.," "A Subsidiary of PFIZER INC." Id. at 977, 975, 1686; see also id. at 975 (small print on technical data sheets, requiring "WRITTEN PERMISSION FROM PFIZER INC." to reproduce materials). Notably, as Vernon and fellow workers at PSNS observed, the bag labels on Insulag and Panelag referenced Pfizer. Post-1968, the bags identified Quigley as the manufacturer and Pfizer as the parent company. Id. at 567, 1821, 1824.
¶ 7 After the hazardous effects of asbestos became widely known, more than 160,000 plaintiffs filed asbestos-related suits against Quigley. Many of these suits also named Pfizer as a defendant. Quigley filed for Chapter 11 bankruptcy in 2004. In 2013, the United States District Court for the Southern District of New York approved Quigley's reorganization plan creating an asbestos injury trust under *1211 section 524(g) of the bankruptcy code to compensate asbestos claimants. Id. at 185. To protect the trust and ensure the equitable distribution of relief, the district court issued a "channeling injunction." Id. at 49-51. The channeling injunction requires asbestos claimants to seek relief solely from the trust and enjoins claimants from suing Quigley for asbestos-related injuries. The injunction also bars asbestos-related claims against Pfizer, if based on Pfizer's prior ownership, management, or control of Quigley, including claims based on piercing the corporate veil or successor liability. The channeling injunction does not, however, bar claimants from alleging that Pfizer is liable as an "apparent manufacturer" under Restatement (Second) § 400. Id. at 50-51; see In re Quigley Co ., 676 F.3d 45, 59-62 (2d Cir. 2012) (holding the Quigley channeling injunction is inapplicable to § 400 claims because apparent manufacturer liability hinges on the presence of Pfizer's name and logo on Quigley products, not Pfizer's ownership interest or control of Quigley).
¶ 8 In September 2014, Vernon filed a personal injury action in King County Superior Court against Pfizer and several other companies for damages relating to asbestos exposure throughout his employment at PSNS.[2] CP at 1-4. As permitted by the channeling injunction, the suit sought to impose liability on Pfizer as an apparent manufacturer under § 400 of the Restatement (Second), asserting that Pfizer represented itself as a manufacturer of the Insulag and Panelag products that caused Vernon's mesothelioma. After limited discovery, Pfizer moved for summary judgment on the ground that Rublee could not establish apparent manufacturer liability. Id. at 660.
¶ 9 The trial court held that § 400 applies to pre-WPLA product liability claims in Washington. Id. at 2923. Nonetheless, it granted Pfizer's motion, concluding that "a reasonable purchaser would not have been induced to believe that [Pfizer] was such apparent manufacturer of the injurious products, within the meaning of [Restatement (Second) § 400]." Id. at 2924. Recognizing that the scope and interpretation of § 400 presented questions of first impression in Washington, the trial court issued an order certifying the case for discretionary review pursuant to RAP 2.3(b)(4).
¶ 10 On appeal, a three-judge panel of the Court of Appeals affirmed the trial court, holding that Rublee's evidence did not create a genuine issue of material fact about Pfizer's status as an apparent manufacturer. Rublee v. Carrier Corp. , 199 Wash. App. 364, 383, 398 P.3d 1247 (2017). The panel initially considered whether § 400 applies in Washington and decided to "assume that the Washington Supreme Court would apply § 400 when presented with the appropriate case." Id. at 370-71, 398 P.3d 1247. Applying § 400, the Court of Appeals held that Rublee failed to present evidence sufficient to create an issue of material fact under any of the three tests courts apply for apparent manufacturer liability-objective reliance, actual reliance, and enterprise liability. Id. at 371, 398 P.3d 1247. With respect to the objective reliance test, the court held that apparent manufacturer liability should be viewed from the perspective of a sophisticated user or commercial purchaser of the asbestos products, not from the viewpoint of an ordinary consumer or end user, such as Vernon or other PSNS workers. Id. at 372, 398 P.3d 1247. Concluding that Rublee's evidence fell short of satisfying any theory of apparent manufacturer liability, the Court of Appeals declined to decide "which of these tests, if any, our Supreme Court would adopt." Id. at 371, 398 P.3d 1247.
¶ 11 Rublee petitioned this court for review, which we granted. Rublee v. Carrier Corp. , 189 Wash.2d 1023, 406 P.3d 284 (2017).
ANALYSIS
¶ 12 Summary judgment is appropriate only if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Macias v. Saberhagen Holdings, Inc. , 175 Wash.2d 402, 408, 282 P.3d 1069 (2012) ; CR 56(c). We review a trial court's grant of summary judgment de novo, engaging in the *1212 same inquiry as the trial court. Macias , 175 Wash.2d at 407, 282 P.3d 1069. We consider all facts submitted and all reasonable inferences from the facts in the light most favorable to the nonmoving party. Wilson v. Steinbach , 98 Wash.2d 434, 437, 656 P.2d 1030 (1982).
¶ 13 At the center of this case is the so-called "apparent manufacturer" doctrine, derived from § 400 of the Restatement (Second). The doctrine developed in the early 20th century, many years before the adoption of strict product liability. Rublee , 199 Wash. App. at 370, 398 P.3d 1247. In its broadest formulation, the apparent manufacturer doctrine imposes a manufacturer's liability on a nonmanufacturing entity that holds itself out to the public as the actual manufacturer of a product. Given the doctrine's scant history in our state's product liability jurisprudence, we begin with a brief overview of its development.
¶ 14 Section 400 of the Restatement (Second), entitled "Selling as Own Product Chattel Made by Another," provides:
One who puts out as his own product a chattel manufactured by another is subject to the same liability as though he were its manufacturer.
¶ 15 The official comments to § 400 clarify the scope and applicability of this rule. It applies only where a nonmanufacturing entity " 'puts out a chattel' " by supplying "it to others for their own use or for the use of third persons, either by sale or lease or by gift or loan." RESTATEMENT ( SECOND ) § 400 cmt. a. Comment d to § 400 describes the two predominant ways a nonmanufacturing entity puts out a chattel as its own product: (1) the entity appears to be the manufacturer of the product or (2) the product appears to have been made for the particular entity. In the first situation, the nonmanufacturer "frequently causes the chattel to be used in reliance upon his care in making it"; in the second, the entity causes the product to be used in reliance "upon a belief that he has required it to be made properly for him and that the actor's reputation is an assurance to the user of the quality of the product."
¶ 16 As a historical matter, courts first applied the apparent manufacturer doctrine to retailers and distributors who placed their own house labels on goods that had been manufactured by someone else.[3] In the early 20th century, nonmanufacturing sellers were not generally subject to liability for the defective products they sold unless they altered the goods postmanufacture, breached an express warranty, or otherwise caused the plaintiff's injury. Stein v. Pfizer Inc. , 228 Md. App. 72, 89, 137 A.3d 279 (2016). Against this backdrop, the apparent manufacturer doctrine emerged as a means to impose a manufacturer's liability on certain nonmanufacturing sellers who held themselves out to the public as a product's manufacturer but were otherwise subject to more lenient liability rules than the actual manufacturer. Hebel v. Sherman Equip ., 92 Ill. 2d 368, 371, 442 N.E.2d 199, 65 Ill.Dec. 888 (1982).
¶ 17 The apparent manufacturer doctrine is primarily a "species of estoppel": a nonmanufacturing seller who, through its labeling or advertising of a product, causes the public to believe it is the manufacturer of the product and to purchase the product in reliance on that specific belief is estopped from later denying its identity as the manufacturer for purposes of liability. Id. Under its estoppel-based rationale, the apparent manufacturer doctrine focuses on whether the nonmanufacturing seller induced consumers to believe that the seller actually manufactured the goods in question and to purchase those goods in reliance on that specific belief. RESTATEMENT OF TORTS: NEGLIGENCE § 400 cmt. d ( AM. LAW INST. 1934).[4]
*1213 ¶ 18 The first question in this case is whether Washington should recognize apparent manufacturer liability and adopt Restatement (Second) § 400. Both the majority and the dissent answer this question in the affirmative.
I. The Apparent Manufacturer Doctrine, as Set Forth in § 400 of the Restatement (Second), Applies in Washington
¶ 19 Prior to Rublee , no Washington appellate court had discussed the apparent manufacturer doctrine in any detail. Only a single decision, dating to 1975, briefly acknowledged § 400 but stopped short of adopting it. See Martin v. Schoonover , 13 Wash. App. 48, 54, 533 P.2d 438 (1975) (stating, "[i]f a retailer adopts a product as his own, he is subject to the same liability for negligence as is the manufacturer"). Despite the absence of precedent, the Court of Appeals decided to assume, "[f]or purposes of this appeal," that this court "would apply § 400 when presented with the appropriate case." Rublee , 199 Wash. App. at 371, 398 P.3d 1247. Notably, Pfizer and Rublee agree that § 400 should apply to common law product liability claims in Washington, and neither party presently disputes the Court of Appeals' assumption that it does. We take this opportunity to formally adopt § 400 and recognize the apparent manufacturer doctrine for claims arising before the WPLA's effective date.
¶ 20 Adoption of § 400 builds on our general acceptance of Restatement principles in similar contexts, including our adoption of Restatement (Second) §§ 402A and 388. See Ulmer v. Ford Motor Co. , 75 Wash.2d 522, 531-32, 452 P.2d 729 (1969) (adopting § 402A); Seattle-First Nat'l Bank v. Tabert , 86 Wash.2d 145, 148-49, 542 P.2d 774 (1975) (applying § 402A to sellers and suppliers); Fleming v. Stoddard Wendle Motor Co. , 70 Wash.2d 465, 467-68, 423 P.2d 926 (1967) (adopting § 388). It is also in accord with the clear majority of jurisdictions to consider § 400 and to formally adopt it. See Rublee , 199 Wash. App. at 371, 398 P.3d 1247 ; see also Long v. U.S. Brass Corp ., 333 F.Supp.2d 999, 1003 (D. Colo. 2004) (collecting cases). Federal courts applying Washington law have twice previously concluded that we would adopt § 400 when presented with the opportunity. Turner v. Lockheed Shipbuilding Co ., No. C13-1747 TSZ, 2013 WL 7144096, at *2 (W.D. Wash. Dec. 13, 2013) (court order); Sprague v. Pfizer, Inc. , No. 14-5084 RJB, 2015 WL 144330, at *3 (W.D. Wash. Jan. 12, 2015) (court order). It should therefore come as no surprise that we conclude § 400 appropriately applies to pre-WPLA cases in this state.
¶ 21 Recognizing § 400 for common law claims also aligns with Washington statutory law. In 1981, the Washington Legislature explicitly adopted apparent manufacturer liability in the WPLA by defining "manufacturer" to include "a product seller or entity not otherwise a manufacturer that holds itself out as a manufacturer." RCW 7.72.010(2). In enacting this provision, the legislature reasoned that when an entity "adopts the product as its own, [it] has, in a sense, waived [its] right to immunity and should be subject[ed] to a manufacturer's liability." 1 SENATE JOURNAL , 47th Leg., Reg. Sess., at 625 (Wash. 1981). Without question, the common law apparent manufacturer doctrine reverberates throughout this statement, now incorporated into our statute.
¶ 22 In contrast, the few states that have rejected the apparent manufacturer doctrine have found that their product liability statutes are incompatible with such liability. See Goesel v. Boley Int'l (H.K.) Ltd. , 664 F.Supp.2d 923, 925 (N.D. Ill. 2009) (refusing to apply the apparent manufacturer doctrine because "the Illinois Supreme Court would find that the statutory provisions of the [Product Liability Act] have trumped the earlier judge-made doctrine and have defined the sole predicate for the potential imposition of strict liability on a nonmanufacturer"); Seasword v. Hilti, Inc ., 449 Mich. 542, 537 N.W.2d 221, 224 (1995) (refusing to apply the apparent manufacturer doctrine because "Michigan's existing theories of seller liability *1214 and related tort doctrines ... preclude the need for an apparent-manufacturer doctrine").
¶ 23 Here, we are not faced with any such conflict between common law apparent manufacturer liability under § 400 and the WPLA. The apparent manufacturer doctrine articulated in § 400 is entirely compatible with our state's statutory product liability law. Based on the WPLA's definition of "manufacturer," the act recognizes a cause of action for injuries arising after 1981 against a nonmanufacturing seller whose marketing and other business materials create the appearance that the seller is a manufacturer of a defective product. Claimants such as Vernon, whose injuries occurred prior to the WPLA's adoption, should also have the opportunity to hold nonmanufacturing sellers accountable for injuries caused by allegedly defective products. Formally adopting § 400 for claims arising before 1981 appropriately harmonizes common law product liability and negligence rules with the WPLA.
¶ 24 Having established that § 400 applies in Washington, we must decide what test to apply to determine if a nonmanufacturing entity is an "apparent manufacturer." The Court of Appeals examined three tests for apparent manufacturer liability-objective reliance, actual reliance, and enterprise liability-and held that Rublee's apparent manufacturer claim against Pfizer would fail under any of these tests. Rublee , 199 Wash. App. at 371, 398 P.3d 1247. Significantly, in applying the objective reliance test, the Court of Appeals held that "the objective reliance test depends on the perception of a reasonable purchaser in the actual purchaser's position," meaning "what a reasonable purchaser in the position of PSNS purchasers would have understood." Id. at 376, 398 P.3d 1247. Rublee argues the Court of Appeals erred in analyzing objective reliance as from the perspective of the "sophisticated industrial entity" who actually purchased the product, rather than the ordinary, reasonable consumer who used it. Id. at 372, 398 P.3d 1247 ; Pet. for Review of Margaret Rublee at 7. We agree. Courts should apply the objective reliance test and assess apparent manufacturer liability by considering all of the defendant's relevant representations in the advertising, distribution, and sale of the product from the perspective of an ordinary, reasonable consumer.
II. Under the Objective Reliance Test, Apparent Manufacturer Liability Should Be Viewed from the Perspective of Ordinary, Reasonable Consumers
¶ 25 The apparent manufacturer doctrine revolves around the central question of when nonmanufacturers should be treated as manufacturers for the purpose of liability. The majority of courts following § 400 apply the objective reliance test. Rublee , 199 Wash. App. at 371, 398 P.3d 1247. The objective reliance test asks whether an ordinary, reasonable consumer could infer from the defendant's representations on labels, advertisements, or other relevant materials that the defendant manufactured the harmful product at issue. Id. at 371-72, 398 P.3d 1247.
¶ 26 We join the majority of courts and adopt the objective reliance test for apparent manufacturer liability. Given its "reasonable consumer" focus, the objective reliance test is consistent with our general approach in product liability cases of looking at the reasonable expectations of ordinary users and consumers, not the particular plaintiff.[5] In *1215 fact, both the majority and dissent agree with the adoption of the objective reliance test to determine apparent manufacturer liability. See dissent at 1219-20. In this instance, the dissent simply disagrees with the manner in which the test is applied. Id. Apparent manufacturer liability turns on whether an objectively reasonable consumer looking at Pfizer's representations vis-à-vis Insulag and Panelag could conclude that Pfizer was a manufacturer of the asbestos products. While the dissent would hold that an "objectively reasonable consumer" is best defined as the industrial purchaser in this unique application of apparent manufacturer liability, consideration of the ordinary, reasonable consumer's perspective keeps with existing Washington law.
¶ 27 The Court of Appeals below was quick to point out that Rublee's case varies from the classic apparent manufacturer scenario involving ordinary consumer goods.[6] In Rublee's case, Insulag and Panelag are nonconsumer products that were purchased by a commercial entity, Rublee's employer, but ultimately used by its employees. The situation is further complicated by the fact that Pfizer, the alleged apparent manufacturer, is the corporate parent of the actual manufacturer, Quigley. Based on these facts, the focus in this case is on determining how the objective reliance test applies in situations "[w]here the purchaser and consumer are not one and the same." Suppl. Br. of Pet'r at 2. Specifically, "whose perceptions are determinative to trigger liability under § 400"-the industrial purchaser or the end user of the product? Id.
¶ 28 The Court of Appeals agreed with Pfizer that the test should be applied from the viewpoint of a reasonable commercial purchaser of Insulag and Panelag, i.e., the agents who actually purchased the products for PSNS. Rublee , 199 Wash. App. at 372, 398 P.3d 1247. Observing that "in cases where a sophisticated industrial entity purchased the product, courts have applied the test from the viewpoint of a 'reasonable purchaser' in that position ," id. (emphasis added), the court held that the objective reliance test should be applied from the perspective of a "reasonable industrial purchaser" of the nonconsumer asbestos products. Id. at 375, 398 P.3d 1247.
¶ 29 To support its sophisticated purchaser approach to objective reliance, the Court of Appeals relied primarily on the reasoning in Stein , 228 Md. App. at 98-102, 137 A.3d 279, a Maryland Court of Special Appeals' decision involving a similar apparent manufacturer claim against Pfizer. As in Rublee's case, the issue in Stein was whether Pfizer could be deemed an apparent manufacturer of Insulag, which was manufactured and sold to the plaintiff's employer by Quigley, both before and after Quigley became a wholly owned subsidiary of Pfizer. Id. at 75, 137 A.3d 279.
¶ 30 In deciding which viewpoint to apply in assessing objective reliance, the court in Stein initially concluded that " 'whether a holding out has occurred must be judged from the viewpoint of the purchasing public, and in light of circumstances as of the time of purchase. ' " Id. at 101, 137 A.3d 279 (quoting Hebel , 92 Ill. 2d at 375, 65 Ill.Dec. 888, 442 N.E.2d 199 ). Having determined that the circumstances surrounding the purchase were relevant to analyzing objective reliance, the Stein court resolved that the proper viewpoint from which to judge reliance depends on the type of product and purchaser at issue. According to the court, "in an 'apparent manufacturer' case involving a consumer product," the reliance issue is "merely a question of whether an ordinary, reasonable consumer purchaser would have relied upon a reputed 'apparent manufacturer's' reputation and assurances of quality in deciding whether to purchase the product at *1216 issue." Id. at 102 n.24, 137 A.3d 279. In contrast, where "the product at issue was not a consumer product" and "was purchased by a sophisticated user," id., reliance must be judged "from the perspective of a reasonable purchaser, in the position of the actual purchaser." Id. at 99, 137 A.3d 279.
¶ 31 Applying this reasoning, the court in Stein required the plaintiff to show that "a reasonable purchaser of refractory materials, that is, [the defendant] Bethlehem Steel, during the time period from 1968 to 1974, would have relied upon Pfizer's reputation and assurances of quality in purchasing the refractory material at issue." Id. at 101, 137 A.3d 279. Because "Bethlehem Steel was unquestionably a sophisticated purchaser of Insulag and ... Insulag was not a consumer product," the court held that no reasonable fact finder could conclude that "a reasonable person, in the position of a Bethlehem Steel purchasing manager ..., who had purchased Insulag for decades from Quigley, could have purchased Insulag in reliance upon Pfizer's reputation and assurances of quality." Id. at 102, 137 A.3d 279. As the court elaborated, there could be no reliance when it was "manifest that Bethlehem Steel knew, at all relevant times, that it was purchasing Insulag from Quigley, not Pfizer." Id.
¶ 32 In rejecting Rublee's apparent manufacturer claim, the Court of Appeals indiscriminately adopted the reasoning of Stein , holding that "the objective reliance test depends on the perception of a reasonable purchaser in the actual purchaser's position." Rublee , 199 Wash. App. at 376, 398 P.3d 1247. Focusing on the perspective of a reasonable industrial purchaser in the position of PSNS, the Court of Appeals concluded that "[n]one of the evidence relevant to the understanding of industrial purchasers suggests they would think Pfizer manufactured the [refractory] products." Id.
¶ 33 We reject this "sophisticated purchaser" approach to apparent manufacturer liability as inconsistent with Washington law. We have long recognized that consumer protection is the touchstone of Washington's product liability law. Zamora v. Mobil Oil Corp ., 104 Wash.2d 199, 206, 704 P.2d 584 (1985) (describing the "primary policy justification" for extending strict liability to remote sellers as the provision of " 'maximum of protection' " to consumers). For that reason, the focus of our product liability jurisprudence has always been on the ordinary product consumer. More generally, we do not differentiate between types of users or consumers for purposes of liability. For example, Washington courts have uniformly rejected a sophisticated user defense, under which product distributors are not required to instruct or warn sophisticated users about certain risks because such users are presumably already aware of the risks due to their expertise or sophistication.[7]
¶ 34 The only scenario in which we differentiate between types of users or consumers is in the pharmaceutical or medical device context, where the "learned intermediary" doctrine applies. Under the learned intermediary doctrine, a manufacturer of certain *1217 medical products, obtainable solely through the services of a physician, fulfills its duty to warn when it gives adequate warning to the physician who must prescribe the product. Terhune v. A.H. Robins Co. , 90 Wash.2d 9, 17, 577 P.2d 975 (1978). We adopted this doctrine primarily for public policy reasons focused on preserving the physician-patient relationship, and it is considered sui generis. We have expressly declined to adopt the learned intermediary doctrine in other contexts, particularly where workers are injured using products purchased by their employer. See Ruiz-Guzman v. Amvac Chem. Corp. , 141 Wash.2d 493, 508-11, 7 P.3d 795 (2000) (declining to adopt the learned intermediary doctrine in the pesticide context, where the farm business entity purchased the pesticides, but farm workers applied it).
¶ 35 Pfizer's sophisticated purchaser/informed user approach to apparent manufacturer liability is inconsistent with our consumer-focused product liability law. First, by considering only "evidence relevant to the understanding of industrial purchasers," this approach broadly imports a type of sophisticated user defense into Washington law. Rublee, 199 Wash. App. at 376, 398 P.3d 1247. As noted, a product user's expertise or sophistication is generally irrelevant to a product distributor's liability. Second, by drawing a line between an "ordinary user" and "industrial purchasers" of asbestos products, this approach inches toward expanding the learned intermediary doctrine without a public policy necessity. Terhune , 90 Wash.2d at 16-17, 577 P.2d 975. For these reasons, we reject the "sophisticated purchaser" approach and any notion that objective reliance turns on the nature of the particular product (consumer versus nonconsumer) or the identity of the particular purchaser (informed user versus ordinary end user).[8]
¶ 36 While we reject Pfizer's sophisticated user approach, we also reject Rublee's call to ignore entirely Pfizer's representations made to commercial purchasers. For example, if we accepted as true Rublee's argument that the focus of § 400"is on the perceptions of the end user," we would presumably look only to Pfizer's representations on Insulag and Panelag product packaging, or other similar materials available to the casual observer or end user, in determining whether Pfizer held itself out as the product manufacturer. Pet. for Review of Margaret Rublee at 11. We would ignore the fact that Pfizer's logo appeared on invoices for Insulag and Panelag, as well as on pieces of sales correspondence between Quigley salespeople and their commercial customers. Properly applying § 400, however, this evidence is potentially relevant to the ultimate issue of fact in this case-whether Pfizer held itself out as manufacturer of Insulag and Panelag.
¶ 37 We therefore believe it is appropriate to assess apparent manufacturer liability by considering all evidence relevant to reasonable consumers of the product at issue, consistent with Washington's "ordinary consumer expectation" approach. Under a consumer-focused objective reliance test, the plaintiff is required to show that an ordinary, reasonable consumer could have (1) inferred from the defendant's representations in the *1218 advertising, distribution, and sale of the product that the defendant manufactured the product and (2) relied on the defendant's reputation as an assurance of the product's quality. The nature of the product or purchaser does not change the analysis. Unlike Pfizer's sophisticated purchaser/informed user approach, analyzing objective reliance from the perspective of the ordinary, reasonable consumer is consistent with the logical underpinnings of the apparent manufacturer doctrine and with our consumer-focused product liability law. Moreover, the reasonable consumer approach furthers the apparent manufacturer doctrine's estoppel-based rationale by focusing on all of the defendant's representations, whether on labels, advertisements, and other relevant materials.
¶ 38 Applying the objective reliance test to the facts in this case, resolution of Rublee's apparent manufacturer claim against Pfizer presents a close question that a trier of fact could decide either way. On the one hand, there is sufficient evidence in the record to support a finding of apparent manufacturer liability. The record shows that the labeling of Panelag and Insulag changed after Pfizer acquired Quigley, so that the logo listed both companies as "Manufacturers of Refractories-Insulations." CP at 952, 1028 (emphasis added). The product labels had formerly indicated that Quigley was the (singular) manufacturer. Id. at 923. On advertising fliers and other promotional materials, the Pfizer and Quigley logos appeared side by side, with the plural "Manufacturers of Refractories" printed below. Id. at 952, 1028 (emphasis added). Also relevant is evidence that the technical data sheets for Insulag and Panelag included the Pfizer logo, listed Pfizer's address and telephone number, and instructed readers not to copy any of the information contained on the sheets "WITHOUT WRITTEN PERMISSION FROM PFIZER, INC." Id. at 975, 1686.
¶ 39 On the other hand, as the dissent observes, there is evidence in the record from which a trier of fact could find no apparent manufacturer liability. For example, Pfizer offered testimony that the product labels on bags of Insulag and Panelag identified the corporate relationship between Pfizer and Quigley and showed Quigley as the manufacturer of both products.[9] Id. at 567, 1821, 1824. While Pfizer's logo appears in the top left comer of Quigley's invoices for Insulag and Panelag, Quigley's logo is arguably featured more prominently in the top center, with "A Subsidiary of PFIZER INC." noted underneath it. Id. at 977. The Quigley pocket calendar and stationery similarly include Pfizer's and Quigley's logos, while identifying Quigley as a "Subsidiary of PFIZER, INC." Id. at 965-66, 963.
¶ 40 Considering all of the relevant facts in context and allowing for competing inferences therefrom, Pfizer's status as an apparent manufacturer cannot be decided as a matter of law on summary judgment. There remains a genuine issue of material fact as to whether an ordinary, reasonable consumer of *1219 Insulag and Panelag could infer from all of Pfizer's representations that Pfizer manufactured the asbestos products that caused Vernon's illness and death.
III. Apparent Manufacturer Liability Is Not Limited to Sellers and Others in the "Chain of Distribution"
¶ 41 One final matter merits discussion. As an alternative ground to uphold the order granting summary judgment, Pfizer contends that "the apparent manufacturer doctrine applies only to parties that sell or distribute the product in question." Resp't Pfizer Inc.'s Suppl. Br. at 18. Because "Pfizer neither sold nor distributed the Quigley products," Pfizer asserts that it cannot be liable as an "apparent manufacturer" under § 400. Id. Stated differently, Pfizer argues that an apparent manufacturer must be in the "chain of distribution." We reject this argument.
¶ 42 Starting with § 400 's text and comments, we see no indication that an entity's participation in the chain of distribution is dispositive of apparent manufacturer liability. Section 400 applies to "[o]ne who puts out as his own product a chattel manufactured by another." RESTATEMENT (SECOND) § 400. The words " 'one who puts out a chattel' include anyone who supplies it to others." Id. cmt. a. And as comment d to § 400 clarifies, "one puts out a chattel as his own product when he puts it out under his name or affixes to it his trade name or trademark." The language in § 400 suggests that a nonmanufacturing defendant that places its trade name on products manufactured by another may assume apparent manufacturer liability based on the nature of its representations, regardless of whether it was a link in the chain of distribution. This makes good sense. Like the product assembler, the entity that affixes its trademark to a product manufactured by another represents a level of quality to the consumer and ultimate user, derives an economic benefit from the sale of the product, and should share in the costs of injury resulting from the defective product.
¶ 43 While the dissent would require all apparent manufacturers to be within a product's direct chain of distribution, this is incompatible with the reasonable consumer focus of apparent manufacturer liability. Dissent at 1224. The apparent manufacturer doctrine does not require contractual privity, or focus on sellers and purchasers, as Pfizer maintains. Resp't Pfizer Inc.'s Suppl. Br. at 20. Instead, in addition to cost sharing, the justification for apparent manufacturer liability is that the defendant derives a benefit from including its trade name on a product manufactured by another, representing to consumers that the product is of a certain origin or quality. This is precisely why the doctrine's focus is on the expectations of ordinary, reasonable consumers. We hold that whether Pfizer played a role in the chain of distribution of Insulag or Panelag is not dispositive of Pfizer's status as an "apparent manufacturer."
CONCLUSION
¶ 44 We formally adopt § 400 of the Restatement (Second) and recognize apparent manufacturer liability for claims arising before the WPLA's effective date. In assessing apparent manufacturer liability, we apply the objective reliance test, viewing all of the defendant's relevant representations from the perspective of the ordinary, reasonable consumer. The Court of Appeals erred in holding that objective reliance must be judged solely from the perspective of a sophisticated industrial purchaser of asbestos products. Because Rublee presented sufficient evidence to create a genuine issue of material fact as to whether reasonable consumers could conclude that Pfizer was an apparent manufacture of the asbestos products, we reverse the Court of Appeals and remand for further proceedings.
WE CONCUR:
Johnson, J.
Owens, J.
Madsen, J.
Wiggins, J.

We use Vernon Rublee's first name for clarity, intending no disrespect.

Margaret Rublee converted this case to a wrongful death action following Vernon's death on March 14, 2015.

For a summary of the history of the apparent manufacturer doctrine, see Stein v. Pfizer Inc. , 228 Md. App. 72, 85-98, 137 A.3d 279 (2016). The apparent manufacturer doctrine first appeared in the 1934 publication of the Restatement of Torts: Negligence, as § 400, under the title "Vendor Selling as His Own Product Chattel Made by Another." Restatement of Torts: Negligence § 400 ( Am. Law Inst. 1934).

Comment d to § 400 of the Restatement explains:
The rule stated in this Section applies only where the chattel is so put out as to lead those who use it to believe that it is the product of him who puts it out. The fact that the chattel is sold under the name of the person selling it may be sufficient to induce such a belief, but this is not always so, as where the goods are marked as made for the seller, without stating the name of the maker, or where the seller is known to carry on only a retail business.

For this reason, we reject the actual reliance test, which requires proof that the purchaser or user " 'actually and reasonably relied upon the reputed "apparent manufacturer's" trademark, reputation, or assurances of product quality, in purchasing the defective product at issue.' " Rublee , 199 Wash. App. at 377, 398 P.3d 1247 (quoting Stein , 228 Md. App. at 102, 137 A.3d 279 ). Under this test, a plaintiff cannot establish apparent manufacturer liability absent proof of direct reliance on the nonmanufacturer's representations. In cases like Rublee's, where a commercial entity purchases nonconsumer products, plaintiffs will be hard pressed to prove the entity's actual reliance. Nor would requiring such proof be consistent with our consumer-focused product liability law. Amici rightly complain that this test drifts too far from Washington's "reasonable consumer expectations" focus. See Br. of Amicus Curiae Wash. State Labor Council AFL-CIO at 5; Br. of Amicus Curiae Wash. State Ass'n for Justice Found, at 12-14; Amicus Br. of Am. Ass'n for Justice at 16-17. We reject such a narrow approach to apparent manufacturer liability.

A classic case is Swift & Co. v. Blackwell, 84 F.2d 130 (4th Cir. 1936). There, the plaintiff swallowed broken glass contained in a sealed can of evaporated or condensed milk bearing the Swift & Co. label. Swift argued it was not responsible for the injury because it did not manufacturer the product and had no direct contact or privity with the plaintiff. Id. at 132. The evidence established that the milk product was manufactured by another company for Swift, then sold by Swift to a retailer, who in turn sold the product to the plaintiff. Id. Relying on § 400 of the Restatement , the court concluded that Swift held itself out as the manufacturer by labeling the can as a Swift & Co. product and was therefore subject to manufacturer liability for the defective condition of the product it had sold to the retailer. Id.

This approach is consistent with comment l to Restatement (Second) § 402A, which describes a product liability claimant broadly, stating:
User or consumer. In order for the rule stated in this Section to apply, it is not necessary that the ultimate user or consumer have acquired the product directly from the seller, although the rule applies equally if he does so. He may have acquired it through one or more intermediate dealers. It is not even necessary that the consumer have purchased the product at all. He may be a member of the family of the final purchaser, or his employee, or a guest at his table, or a mere donee from the purchaser. The liability stated is one in tort, and does not require any contractual relation, or privity of contract, between the plaintiff and the defendant.
"Consumers" include not only those who in fact consume the product, but also those who prepare it for consumption; and the housewife who contracts tularemia while cooking rabbits for her husband is included within the rule stated in this Section, as is also the husband who is opening a bottle of beer for his wife to drink. Consumption includes all ultimate uses for which the product is intended, and the customer in a beauty shop to whose hair a permanent wave solution is applied by the shop is a consumer. "User" includes those who are passively enjoying the benefit of the product, as in the case of passengers in automobiles or airplanes, as well as those who are utilizing it for the purpose of doing work upon it, as in the case of an employee of the ultimate buyer who is making repairs upon the automobile which he has purchased.

The analysis in Brandimarti v. Caterpillar Tractor Co ., 364 Pa. Super. 26, 527 A.2d 134 (1987), provides a useful example of how the reasonable consumer approach to objective reliance properly applies to cases involving nonconsumer products in commercial settings. In Brandimarti, the plaintiff was injured when the forklift he was operating overturned. Id. at 28, 527 A.2d 134. The record indicated that the forklift was purchased by the plaintiff's employer and manufactured by Towmotor Inc., a wholly owned subsidiary of the defendant, Caterpillar Tractor Company. Id. at 35, 527 A.2d 134. Although the forklift was manufactured by Towmotor, "[t]he Caterpillar trade name was, however, conspicuously displayed on the forklift." Id. (emphasis omitted). The Brandimarti court held that "[u]nder such circumstances Caterpillar could expect others to purchase the product in reliance on the skill and reputation associated with the Caterpillar name." Id. at 36, 527 A.2d 134. Rather than focusing on the fact that the forklift was a nonconsumer product purchased by a commercial entity, the court based its holding on the rationale underlying the apparent manufacturer doctrine: "The Restatement (Second) of Torts § 400 was drafted in recognition of the fact that where one's name appears on a product 'the actor's reputation is an assurance to the user of the quality of the product.' " Id. (quoting Restatement (Second) § 400 cmt. d). As noted, under the Restatement product "users" include both purchasers and end users who did not directly purchase the product. Restatement (Second) § 402A cmt. l .

We caution, however, that comment d to § 400 suggests that this type of labeling is not necessarily dispositive. Restatement (Second) § 400 cmt. d. According to comment d:
The mere fact that the goods are marked with such additional words as "made for" the seller, or describe him as a distributor, particularly in the absence of a clear and distinctive designation of the real manufacturer or packer, is not sufficient to make inapplicable the rule stated in this Section. The casual reader of a label is likely to rely upon the featured name, trade name, or trademark, and overlook the qualification of the description of source. So too, the fact that the seller is known to carry on only a retail business does not prevent him from putting out as his own product a chattel which is marked in such a way as to indicate clearly it is put out as his product. However, where the real manufacturer or packer is clearly and accurately identified on the label or other markings on the goods, and it is also clearly stated that another who is also named has nothing to do with the goods except to distribute or sell them , the latter does not put out such goods as his own.
(Emphasis added.) Thus, even assuming Quigley was identified as the product manufacturer, Pfizer is not relieved of liability when its name also appears on the product unaccompanied by a statement clarifying that Pfizer had nothing to do with the goods except to distribute or sell them. See Carter v. Joseph Bancroft & Sons Co. , 360 F.Supp. 1103, 1107 (E.D. Penn. 1973) (holding defendants liable as apparent manufacturers of a defective dress when the dress label identified the actual manufacturer and included the defendants' trademark but did not "clearly state that defendants had nothing to do with the goods except to distribute or sell them").