# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| K.C. and L.M., | No. 51400-1-II |
| Appellants, | |
| v. | |
| STATE OF WASHINGTON and DEPARTMENT OF SOCIAL AND HEALTH SERVICES, and DONNA JOHNSON, | UNPUBLISHED OPINION |
| Respondents, | |
| GOOD SAMARITAN HOSPITAL, PATRICK SHEEHY, Ph.D. and LINDA WILLIAMS, M.S.W., | |
| Defendants. | |

CRUSER, J. — In 2013, KC and LM sued the Department of Social and Health Services (DSHS)[1] for allegedly failing to investigate and remove them from the home of their stepfather, Walter Johnson. Johnson lived with KC and LM from the mid-1980s to the early 1990s, during which time he sexually abused them.

---

[1] Starting July 1, 2018, the Department of Social and Health Services and the Children's Administration and Department of Early Learning ceased to exist, and the Department of Children, Youth, and Families took over all functions of both agencies. Because the lawsuit in this case commenced before the name change, we refer to the agency as DSHS.

DSHS moved for summary judgment on the basis that no evidence established breach or causation. DSHS also argued that KC's claim was barred by the statute of limitations and that both KC's and LM's claims were barred by laches. The trial court granted DSHS' motion.

We reverse and remand for further proceedings.

FACTS

I. 1980-1985 EVENTS

In March 1980, the State charged Johnson with one count of second degree statutory rape and one count of indecent liberties as to his biological daughters. One daughter was 15 years old at the time, and the other daughter, JJ, was 11 years old. Johnson pleaded guilty to one count of indecent liberties. The court sentenced Johnson to 5 years of probation. JJ was then removed from Johnson's home.

Sometime before 1985 and while he was still on probation, Johnson began a relationship with Donna Melby.[2] The court allowed Johnson to begin living with Donna and her minor children, including KC and LM.[3] KC was born in October 1978, and LM was born in February 1977.

---

[2] Donna Melby later became Donna Johnson. For purposes of clarity, we use her first name.

[3] Johnson's parole officer sought the court's opinion as to whether such a living arrangement was advisable. The parole officer had received conflicting recommendations from Johnson's initial court-appointed counselor and his counselor at the time, and sent a letter to the court seeking its guidance. Johnson's counselor at the time recommended that Johnson and Donna live together. Johnson's first counselor, however, advocated against the living arrangement. The counselor stated that Johnson had not taken accountability for his sexual abuse of his daughters and was "greatly concerned . . . that Mr. Johnson may molest [KC and LM]." Clerk's Papers (CP) at 527. The record does not contain the court's response to the parole officer's letter, but presumably it authorized the living arrangement.

In August 1985, Johnson completed his probation, withdrew his guilty plea, and the court dismissed the charge. The court order indicates that at one point while Johnson lived with Donna on probation, Donna's former husband accused Johnson of molesting KC and LM. The order stated that "[t]he family underwent a vigorous investigation by Children's Protective Services as well as the juvenile courts and probation officer, and it was determined that the allegations were untrue." Clerk's Papers (CP) at 73. The court was not aware of any other complaints of deviant sexual behavior.

## II. 1986 JJ ABUSE ALLEGATION

At some point before 1985, JJ began living with Johnson and Donna despite Johnson's prior abuse of her. In February 1986, JJ alleged that Johnson was again sexually abusing her. JJ wrote a statement detailing incidents of Johnson touching her inappropriately and making her model revealing clothing for him.

As a result, DSHS filed a dependency petition, and the court entered a shelter care order. The court found "that [JJ's] health, safety and welfare [would] be seriously endangered if [she was] not taken into custody." *Id.* at 714. The dependency petition noted that Johnson had previously been convicted of indecent liberties as to JJ. DSHS was also aware that Johnson lived in a home with Donna, JJ, KC, and LM.

DSHS also referred JJ's allegations to the police. Approximately one month later, the prosecutor's office made the decision not to charge Johnson.[4]

---

[4] According to Donna, JJ later "recanted and told her [biological] mother that she had [accused Johnson] just to get out of the house." CP at 285. However, it is unclear when JJ's alleged recantation occurred. Additionally, no evidence exists as to whether JJ also recanted to state authorities. The record does not reveal why the prosecutor's office decided not to charge Johnson.

In June 1986, the court entered agreed orders of dependency regarding JJ for both Johnson and JJ's mother. As to Johnson, the court found that JJ was dependent because (1) she was unwilling to reside in Johnson's custody and (2) Johnson was unwilling to take custody of her. As to JJ's mother, the court found that (1) there was no parent or guardian available to care for JJ, (2) JJ was unwilling to reside in her mother's custody, (3) JJ's mother was unwilling to take custody of JJ, and (4) "[a] manifest danger exists that the child will suffer serious abuse or neglect if the child is not removed from the home." *Id.* at 685. The court nevertheless placed JJ in her mother's care.

At this time, LM was nine years old, and KC was seven years old. The evidence suggests that Johnson had already begun sexually abusing them by February 1986. However, there is no evidence that DSHS investigated whether Johnson was abusing KC and LM as well as JJ. KC does not remember speaking with therapists, social workers, or government officials about her household before she was eight or nine years old. And DSHS took no steps to separate Johnson from KC and LM.

### III.  1990-1992 ABUSE ALLEGATIONS

A few years later, DSHS started receiving referrals about potential abuse of KC and LM. On November 16, 1990, DSHS received a referral from one of LM's schoolteachers, Elaine Miller. LM told Miller that her brother, Ken, had been molesting her for the past year. LM told Miller that Johnson was also abusing her. LM said that Johnson would enter her bedroom at night and would pull down her underwear.

On November 28, 1990, DSHS records indicate that Donna told the agency that she was not aware of sexual abuse within the family. However, Donna felt that LM had been sexually abused by an acquaintance of the family.

The following day, DSHS filed a report of abuse and neglect to the police. DSHS noted that LM was subject to physical and sexual abuse, and that Donna failed to protect. As to the referral made by Miller on November 16, 1990, DSHS reports indicate that it was unable to complete its own investigation, and it made "No Finding." *Id.* at 655-56. There is no indication as to why DSHS was unable to complete its investigation.

In December 1990, DSHS received a referral from Ann Kaluzny, a social worker who had spoken with KC. Kaluzny reported that KC seemed uncomfortable with Johnson living in the home. Kaluzny also noted that Donna was ignoring Johnson's actions and did not believe he was an offender.

In January 1991, the police interviewed LM and Donna. LM denied that she was touched. She said she did not remember telling Miller otherwise. However, LM said that Johnson or Ken might have molested KC. In her written statement given the same day, LM said that one time she awoke and Johnson was in her bedroom staring at her. Johnson pulled down her underwear, but then LM jumped up, and Johnson left.

A few weeks later, the police interviewed KC. KC denied that either Johnson or Ken touched her.

The prosecutor's office decided not to press charges against Ken. Although no records indicate as much, presumably the prosecutor's office made the same determination as to Johnson.

DSHS reports indicate that it was unable to complete its own investigation, and it made "No Finding." *Id.* at 655.

In May 1991, DSHS received another referral from Miller. Miller said that KC and LM's family was incestuous. Miller reported that Donna put a lock on LM's door to keep Ken out and that recently, KC had awoken to find Ken in her room. Miller noted that Donna was "basically in denial." *Id.* at 124. She also noted that the "whole family is caught up in covering up behavior and avoiding dealing with issues" by "mak[ing] allegations and then recant[ing] them." *Id.* DSHS reports indicate that it was unable to complete its own investigation, and it made "No Finding." *Id.* at 654.

In October 1991, Donna and Johnson separated. However, even after their separation, LM and KC continued to tell school counselors that Johnson was being given access to them, was touching them inappropriately, and was making sexual comments directed at them. At one point, LM wrote a letter discussing the abuse that she had suffered throughout her childhood. LM's letter discussed how, when she was younger, Johnson would "come to [her] room at night [and] pull down [her] covers [and] pull [her] underwear down." *Id.* at 278. LM said that Johnson used her to see if he could still get erect. LM discussed how, on one occasion, Johnson told her that he wanted to perform oral sex on her. LM also discussed Johnson's sexual abuse of other members of her family.

Shortly thereafter, Johnson died. At no point did DSHS file a dependency petition as to either KC or LM.

## IV. KC'S INJURIES[5]

In 2012, KC was diagnosed with post-traumatic stress disorder (PTSD) and began taking medicine to deal with her symptoms. Those symptoms included depression, anxiety, and suicidal thoughts. KC's symptoms had been present her entire adult life. However, KC claims that she did not attribute her symptoms to Johnson's sexual abuse until 2012.

## V. LAWSUIT

In 2013, KC and LM sued DSHS. They alleged that Johnson began abusing them immediately upon living together, DSHS acted negligently by inadequately investigating the allegations of abuse and by failing to remove them from the home, and as a result, they suffered years of preventable abuse.

After some discovery, DSHS moved for summary judgment, claiming that no genuine issue of material fact existed as to breach and causation, that KC's claims were barred by the statute of limitations, and that laches applied.

KC and LM opposed summary judgment. They relied in part on the declaration of Barbara Stone, who worked for DSHS from 1968 until 2000. Stone stated that after receiving the referrals of abuse, DSHS acted negligently by failing to act on those referrals. Specifically, Stone stated that when DSHS removed JJ from Johnson's home in February 1986 based on renewed allegations of sexual abuse, DSHS did not follow standard practices when it failed to remove or otherwise protect all the children in Johnson's home. Stone also suggested that a proper investigation in

---

[5] Legal arguments related to LM's injuries have been previously resolved by this court and thus are not relevant to the issues currently on appeal. *See K.C. v. Johnson*, No. 48029-9-II, slip op. at 15 (Feb. 28, 2017), http://www.courts.wa.gov/opinions/.

1986 would have revealed a risk that Johnson was sexually abusing KC and LM. Finally, Stone stated that if DSHS had conducted proper investigations pursuant to KC's and LM's allegations of abuse occurring in the 1990s, DSHS would have removed them from Johnson's home.

In her declaration, LM stated that "[i]f anyone would have believed [her] and promised to keep [her and her family] safe [she] would have told." *Id.* at 401.

The trial court granted DSHS' motion for summary judgment. The court based its decision on the fact that KC and LM's case was speculative. The court also ruled that the statute of limitations barred KC's claim.

KC and LM then amended their complaint to add, among others, the hospital that had employed the counselor who had recommended that Johnson live with Donna, KC, and LM. The hospital filed for summary judgment on the same grounds that DSHS had. The hospital also argued that KC was collaterally estopped from relitigating whether her claims were barred by the statute of limitations.

This time, the trial court denied the motion for summary judgment. The hospital interlocutory appealed, and we granted review. We ruled that KC was not collaterally estopped from relitigating whether her claims were time-barred. *K.C. v. Johnson*, No. 48029-9-II, slip op. at 15 (Feb. 28, 2017), http://www.courts.wa.gov/opinions/. We also ruled that a genuine issue of material fact existed as to whether LM's claims were time-barred, precluding summary judgment. *Id.* at 16-17. However, the hospital did not argue on appeal that KC's claims were in fact barred by the statute of limitations. *Id.* at 8 n.4.

KC and LM now appeal the trial court's grant of summary judgment to DSHS.

## ANALYSIS

### I. STANDARD OF REVIEW

We review an order for summary judgment de novo, performing the same inquiry as the trial court. *Aba Sheikh v. Choe*, 156 Wn.2d 441, 447, 128 P.3d 574 (2006). "We consider all facts submitted and all reasonable inferences from the facts in the light most favorable to the nonmoving party." *Rublee v. Carrier Corp.*, 192 Wn.2d 190, 199, 428 P.3d 1207 (2018). "Summary judgment is proper when the record demonstrates there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." *Munich v. Skagit Emergency Commc'ns Ctr.*, 175 Wn.2d 871, 877, 288 P.3d 328 (2012).

### II. NEGLIGENT INVESTIGATION

KC and LM argue that genuine issues of material fact exist as to (1) whether DSHS breached its duty to investigate under former RCW 26.44.050 (2012) and (2) whether the breach proximately caused a harmful placement decision. We agree.

### A. LEGAL PRINCIPLES

Former RCW 26.44.050 provides that DSHS must investigate reports of abuse or neglect of a child. Additionally, during its investigation, DSHS "has [a] duty to act reasonably in relation to all members of the family." *Tyner v. Dep't of Soc. & Health Servs.*, 141 Wn.2d 68, 79, 1 P.3d 1148 (2000). Based on this statutory duty, children have an implied cause of action against DSHS for negligent investigation under certain circumstances. *M.W. v. Dep't of Soc. & Health Servs.*, 149 Wn.2d 589, 595, 70 P.3d 954 (2003). The negligent investigation cause of action based on former RCW 26.44.050 is a "narrow exception" to the rule that there is no general tort claim for negligent investigation. *M.W.*, 149 Wn.2d at 601.

9

To prevail on a negligent investigation claim, a plaintiff must prove both that (1) DSHS breached its duty of care by failing to conduct an adequate investigation and (2) the investigation's inadequacy proximately caused a harmful placement decision by DSHS. *Id.* at 595. A harmful placement decision includes "letting a child remain in an abusive home." *Id.* at 602.

Whether a defendant breached its duty is generally a question of fact. *See Hertog v. City of Seattle*, 138 Wn.2d 265, 275, 979 P.2d 400 (1999); *Yonker v. Dep't of Soc. & Health Servs.*, 85 Wn. App. 71, 76, 930 P.2d 958 (1997). However, summary judgment is appropriate if reasonable minds could reach only one conclusion. *Hertog*, 138 Wn.2d at 275.

Proximate cause has two elements: cause in fact and legal causation. *Tyner*, 141 Wn.2d at 82. Cause in fact exists when "but for" the defendant's actions, the claimant would not have been injured. *Id.* Cause in fact generally is a jury question. *Id.* Legal causation involves a policy determination as to how far the consequences of an act should extend and generally is a legal question. *Id.*; *see Schooley v. Pinch's Deli Market, Inc.*, 134 Wn.2d 468, 478-79, 951 P.2d 749 (1998) (focusing on "whether, as a matter of policy, the connection between the ultimate result and the act of the defendant is too remote or insubstantial to impose liability").

B. EXISTENCE OF A DUTY

KC and LM allege that DSHS owed them a duty to investigate allegations of abuse. Additionally, Stone contends that, at all relevant times, DSHS' standard practice was to investigate abuse as to all children in a home when allegations of abuse were made by one child in the home.

DSHS does not argue that it did not owe KC and LM a duty based on JJ's reported abuse in 1986. The agency also does not dispute that it owed a duty to KC or LM based on the other incidents of reported abuse during the 1990s.

Thus, we need not decide whether DSHS' duty to investigate always extends to other children in a home when allegations of abuse are made by one child in the same home. Instead, we simply conclude that, based upon the facts here, JJ's allegation of abuse in 1986 triggered DSHS' duty to investigate as to KC and LM, as well as to JJ. Similarly, we conclude that KC's allegations of abuse in the 1990s triggered DSHS' duty to investigate as to both KC and LM, and LM's allegations of abuse in the 1990s likewise triggered DSHS' duty to investigate as to both children.

C. BREACH

KC and LM argue that genuine issues of material fact exist regarding whether DSHS breached its duty to investigate both in 1986 and in the 1990s. We agree.

In 1986, DSHS received a report that Johnson was sexually abusing JJ. DSHS was aware that Johnson had previously sexually abused JJ and had been convicted of indecent liberties for doing so.

During this time, Johnson lived in a home with Donna, JJ, KC, and LM. DSHS was aware of the living situation.

Shortly after JJ reported the abuse, DSHS filed a dependency petition, but only as to JJ. The petition detailed Johnson's past and present sexual abuse of JJ.

At this time, KC and LM, ages 7 and 9 respectively, were in an at-risk age range given that Johnson had been convicted of sexually abusing his 11-year-old daughter a few years prior. Yet,

11

KC does not remember being interviewed about whether Johnson was abusing her until months after DSHS had removed JJ from their home.[6]

Stone claims that DSHS did not conduct an adequate investigation based upon JJ's reported abuse because a reasonable investigation would have uncovered that Johnson was abusing KC and LM. As a result, DSHS would have removed them from the home or otherwise implemented adequate safeguards. This, Stone claims, was standard practice.

Based on the above, a genuine issue of material fact exists as to whether DSHS breached its duty to conduct an adequate investigation and act reasonably pursuant to such an investigation.

Additionally, subsequent referrals to DSHS in the 1990s alerted the agency about potential abuse of KC and LM by Johnson. These allegations further triggered the agency's duty to investigate. Many of these allegations contained factual similarities, both to each other and to prior allegations against Johnson, and for many of these instances, DSHS records indicate that it was unable to complete its own investigation. Based on these reported instances of abuse, a reasonable jury could find that DSHS breached its duty to conduct an adequate investigation.

For example, in 1991, LM disclosed that Johnson was abusing her, but when the police interviewed LM, she denied that Johnson touched her. However, LM did not fully recant. She maintained that one time while she was in bed, she awoke, and Johnson was in her bedroom and pulled down her underwear. A reasonable jury could find that DSHS did not conduct an adequate investigation because such an investigation would have uncovered that Johnson was continuing to abuse KC and LM.

---

[6] At summary judgment, we must view the evidence in the light most favorable to KC and LM. KC claims that she did not remember being interviewed until she was eight or nine years old. KC was seven years old when JJ reported her abuse. She turned eight years old eight months later.

Viewing the facts in the light most favorable to KC and LM, a reasonable jury could find that DSHS failed to conduct an adequate investigation as to KC and LM.

D.  CAUSE IN FACT

KC and LM argue that due to the allegations of sexual abuse occurring in their household, genuine issues of material fact exist as to whether DSHS caused a harmful placement decision. We agree.

Whether a reasonable jury could find cause in fact satisfied here is largely determined by answering the following question:  if DSHS had conducted an adequate investigation, would they have discovered that Johnson was abusing KC and LM?

Viewing the evidence in the light most favorable to KC and LM, we must answer in the affirmative.  The record supports at least an inference that Johnson began sexually abusing KC and LM prior to 1986.  The record suggests that Johnson began abusing KC and LM when they were about four years old and that his abuse worsened as they got older.

Additionally, LM stated that "[i]f anyone would have believed [her] and promised to keep [her and her family] safe [she] would have told."  CP at 401.  Thus, the evidence shows there is a genuine issue of material fact that if DSHS had conducted an adequate investigation and interviewed KC and LM, the agency would have learned that Johnson was abusing them. Furthermore, Stone suggests that a proper investigation in 1986 would have revealed a risk that Johnson was sexually abusing KC and LM.  We have determined that this presents a question for the jury in similar situations.  *See, e.g.*, *H.B.H. v. State*, 197 Wn. App. 77, 93-95, 387 P.3d 1093 (2016), *aff'd*, 192 Wn.2d 154, 429 P.3d 484 (2018).

We recognize that in 1991, LM denied to the police that Johnson was abusing her. However, LM's denial only further highlights that the question we posed above is indeed one of fact. LM stated in a declaration that she would have disclosed if she would have been promised that she and her family would be safe. The fact that she denied that Johnson was abusing her in 1991 suggests otherwise. Such conflicting evidence presents a question for the jury.

DSHS contends that JJ's 1986 allegations of abuse were not sexual in nature. DSHS' argument relies on a statement by Donna regarding JJ's alleged recantation. Although DSHS contends that JJ recanted her 1986 sexual abuse allegations shortly after making them and that it was aware of her recantation at that time, the record only supports DSHS' argument if we view it in a light most favorable to DSHS. We decline to do so. Instead, the record simply shows that at some time between 1986 and 1992, JJ told her biological mother that she made up the 1986 allegations of abuse. It is unclear whether JJ made similar statements to DSHS or the police, and it is unclear when JJ told this to her mother.

As a result, we must view the evidence as if DSHS was unaware that JJ recanted in 1986. And if DSHS was unaware in 1986 that JJ recanted her allegation of sexual abuse, then it removed JJ from Johnson's home due to the fact that she alleged he was sexually abusing her. DSHS was aware, at that time, that Johnson lived with KC and LM. Thus, upon DSHS' completion of an adequate investigation (one that uncovered Johnson's abuse of KC and LM), DSHS could similarly have removed them.

Therefore, viewing the evidence in the light most favorable to KC and LM, a reasonable jury could find that DSHS' inadequate investigation proximately caused a harmful placement decision in 1986. A reasonable jury could find that if DSHS would have conducted an adequate

14

investigation, it would have discovered that Johnson was abusing KC and LM, and it could have removed them from Johnson's home or otherwise protected them from him. Furthermore, a reasonable jury could find that the agency's failure to do either caused KC and LM to be left in an abusive home with Johnson.

Finally, KC's and LM's allegations of abuse in the 1990s present further questions of material fact. At various times, KC and LM each reported Johnson's abuse. As noted above, LM stated that she would have confirmed the abuse if certain conditions had been met. And although LM denied to the police that Johnson touched her, as noted above, she also confirmed at that same time that Johnson had in fact abused her in the past.

As discussed previously, a reasonable jury could find that DSHS conducted an inadequate investigation. Here, we conclude that a reasonable jury could find that the investigation's inadequacy proximately caused, in 1986 or later in the 1990s, a harmful placement decision by DSHS as to both KC and LM.

E. LEGAL CAUSATION

DSHS argues that KC and LM cannot establish legal causation because evidence has either been lost or destroyed and therefore KC's and LM's claims simply rely on speculation. We disagree.

DSHS is tasked with adequately investigating reported abuse and acting reasonably pursuant to those investigations. We conclude that the connection between KC's and LM's injuries, sexual abuse over a number of years, and DSHS' failure to investigate and act reasonably is not, as a matter of law, "too remote or insubstantial to impose liability." *Schooley*, 134 Wn.2d at 478-79.

### III. STATUTE OF LIMITATIONS

KC and LM argue that dismissing KC's claim at summary judgment based on the statute of limitations grounds was improper. We agree.

Under RCW 4.16.340(1)(c), a childhood sexual assault victim's three-year statute of limitations is tolled until "the victim discovered that the act caused the injury for which the claim is brought." This statutory tolling provision "'is unique [because] . . . it specifically focuses on when a victim of sexual abuse discovers the causal link between the abuse and the injury for which the suit is brought.'" *B.R. v. Horsley*, 186 Wn. App. 294, 299, 345 P.3d 836 (2015) (quoting *Korst v. McMahon*, 136 Wn. App. 202, 208, 148 P.3d 1081 (2006)). The statute of limitations does not begin when a victim identifies an injury, but rather when a victim associates an injury with prior abuse. *Id.* at 299-301.

Here, KC claims that she did not associate her lifelong symptoms of depression, anxiety, and suicidal thoughts with her childhood sexual abuse until 2012, when she was diagnosed with PTSD. Because we are reviewing DSHS' motion for summary judgment, we must accept KC's assertion as true. *Rublee*, 192 Wn.2d at 199.

Therefore, because KC and LM filed their lawsuit in 2013, well within three years from when she associated her injuries to her abuse, the trial court erred in granting summary judgment as to KC's claim.

### IV. LACHES

DSHS argues that laches bars KC's and LM's claims. It contends that it raised the issue below and thus preserved its argument on appeal. We agree that the issue is preserved but conclude that laches does not bar KC's and LM's claims.

Laches is an equitable defense to an action. *Newport Yacht Basin Ass'n of Condo. Owners v. Supreme Nw., Inc.*, 168 Wn. App. 56, 76, 277 P.3d 18 (2012). Laches involves two elements: (1) inexcusable delay in commencing an action and (2) prejudice to the other party because of the delay. *Auto. United Trades Org. v. State*, 175 Wn.2d 537, 542, 286 P.3d 377 (2012). Laches is an extraordinary remedy that generally is not applied when the action is filed within the applicable limitation period. *Harmony at Madrona Park Owners Ass'n v. Madison Harmony Dev., Inc.*, 143 Wn. App. 345, 362, 177 P.3d 755 (2008). The party asserting laches has the burden of proof. *Newport Yacht Basin*, 168 Wn. App. at 77.

The main component of laches is not the length of the delay, but the resulting prejudice to others. *Clark County Pub. Util. Dist. No. 1 v. Wilkinson*, 139 Wn.2d 840, 849, 991 P.2d 1161 (2000). Application of laches requires some change in a party's condition that would make a delay in asserting a claim inequitable. *Newport Yacht Basin*, 168 Wn. App. at 77.

Our legislature has recognized that

> sexual abuse is a pervasive problem that affects the safety and well-being of many citizens. Childhood sexual abuse is traumatic, and the damage is long-lasting. Victims may not only repress the memory of the abuse for many years after the abuse occurred, but may also be unable to connect being abused with any injury until later in life.

H.B. REP. ON ENGROSSED SUBSTITUTE H.B. 2058, at 2, 52d Leg., Reg. Sess. (Wash. 1991).

To afford sexual abuse victims an avenue for relief, the legislature amended RCW 4.16.340 to toll the three-year statute of limitations until the victim discovers that their abuse caused their injury. In doing so, the legislature expressed its intent that victims be afforded a cause of action later in life.

Because the legislature recognizes that sexual abuse victims' delay in filing lawsuits is excusable delay, DSHS cannot satisfy the first element of laches. As a result, the doctrine does not bar KC's and LM's claims.

## CONCLUSION

We conclude that genuine issues of material fact exist as to whether DSHS breached its duty to investigate under former RCW 26.44.050 and whether the breach caused a harmful placement decision. We also conclude that legal causation exists. Additionally, we conclude that the statute of limitations does not bar KC's claim and that the doctrine of laches does not bar KC and LM's lawsuit.

Therefore, the trial court's grant of summary judgment was improper, and we reverse and remand for further proceedings.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

CRUSER, J.

We concur:

MAXA, C.J.

SUTTON, J.